**Pyle et al. v. Oakmont Municipal Authority**

*Warren H. Van Kirk* and *John D. S. Truxall,* for plaintiffs.

*Frederick Shoemaker,* for defendant.

MONTGOMERY, J., July 9, 1948.—The pleadings consist of a bill of complaint seeking an injunction to restrain defendant from abandoning a water main and discontinuing water service to plaintiffs, an answer on the merits containing new matter, and an answer to the new matter.

### Findings of Fact

1. Defendant is a municipal authority incorporated May 3, 1943, under the Municipality Authorities Act of June 28, 1935, P. L. 463, as amended and supplemented, for the purpose of acquiring, holding, constructing, improving, maintaining, operating, working, leasing water works, water supply works, and water distribution systems and has all the powers and duties conferred or imposed thereby and is subject to the limitations thereof. It maintains a general office in the Borough of Oakmont and a water department office in the Borough of Verona, Allegheny County.

2. By deed dated August 15, 1946, and recorded in Deed Book vol. 2919, p. 21, the Suburban Water Company of Allegheny County, a public utility corporation which had, prior to that time, owned and operated water works and water distribution systems in various parts of Allegheny County, including the Townships of Plum and Penn, conveyed and transferred to defendant its interest, right and title to all of its assets including water works, systems, easements, rights-of-way, franchises, and all other property, which included a section of an eight-inch steel water main, 7,000 feet in length,

extending from the intersection of North Avenue and Ninth Street in Penn Township, eastwardly to the property of Pyle-Hollen and Yeager, plaintiffs, in Plum Township, at which point said section of line or main ended.

3. At the time of transfer of said assets to defendant, water through said line was being supplied to plaintiffs, to a tenant of plaintiffs (Grimensteins), to a tenant of plaintiffs (Yeagers) and to no others, with one exception, viz., Kent McDonald, the owner of a house and small piece of ground located near the Yeagers' house and property, who was securing his water by carrying it from a spigot on Yeagers' property.

4. The 7,000-foot section of main, aforementioned, was originally part of a transmittal main laid by the Suburban Water company in 1898 from its reservoir located in the Borough of Verona to another reservoir owned by it at North Bessemer for the purpose of supplying water to the Union Railroad and the North Bessemer Railroad for use in their shops and in the houses of their employes located there and was not constructed as a service line for domestic consumers between the two reservoirs. However, after the construction of this line, the Suburban Water Company permitted connections for domestic consumers to be made between McAbee Pumping Station, which was approximately 3,000 feet east of the present end of the 7,000-foot section involved here and the North Bessemer Reservoir, to supply approximately 20 consumers in the vicinity of the pumping station and also numerous consumers at Milltown, also between those points.

5. In 1937 the Suburban Water Company constructed a new 10-inch cast iron main from its reservoir in Verona to its reservoir at North Bessemer by an entirely different route, shorter and more direct than

the route of the old eight-inch steel main, and thereafter used that main to fill the reservoir at North Bessemer. About 1942 it abandoned a section of the old eight-inch steel main from a point near the property of Pyle-Hollen and Yeager east to the McAbee Pumping Station and, also at that time or shortly thereafter abandoned the pumping station. Thereafter the water found its way into the section of the old eight-inch steel main between McAbee Pumping Station and the North Bessemer Reservoir by gravitation from the reservoir where previously it had been pumped from the Verona Reservoir.

6. Plaintiffs Grimensteins now receive their water from a tap on the 7,000-foot section of the eight-inch main, aforesaid, which was originally connected about 1907 when the property they occupy was used as a school. The water used by them and their tenant is measured by a meter and paid for according to a two-family contract, dated February 2, 1944, between them and the Suburban Water Company which reserved to the company the right to terminate the contract upon 30 days' written notice.

7. Yeagers receive their water through a tap from the same line, which was installed prior to their occupancy and ownership of the premises. The amount of water they use is measured by meter and is paid for under a one-family contract, dated May 26, 1947, with a 30-day cancellation clause, the supplying of their tenant and of Kent McDonald, not being permissible under the terms of their contract.

8. In 1947 Kent McDonald (not a party to this proceedings) applied to defendant for a contract for water, which was refused; the reason assigned by defendant being that it contemplated abandoning the line and terminating all service.

9. Pyle and Hollen, plaintiffs, have been receiving water without charge from the main for approximately

21 years, or from the time of their original occupancy of the 108-acre tract which they now own. At the present time, they receive the water from a tap running from the main to their barn which was installed about 1943. For sometime prior to that date, they utilized a spigot on the Yeager property, then owned by Baroni, from which to secure their water for their barn and dairy purposes.

10. Pyle and Hollen base their claim for free water on an agreement entered into between the Suburban Water Company of Allegheny County, and Robert Black, dated June 24, 1897, and recorded in Deed Book vol. 1086, p. 80, which was a grant to the company by Black of a right-of-way across the farm, now owned by Pyle and Hollen, over which the eight-inch line was laid. Concerning the matter of free water, the agreement contained the following provisions:

"The said grantee to have water for the use of two houses now erected on said land from the line when laid for the term of ten years or so much longer as the line remains on said ground and in case the line should be removed before the expiration of ten years, the said grantee is to pay to the grantor the sum of $500.00. The grantee to put one-half inch tap on line for use of grantor."

One of the houses referred to in the agreement was razed by Pyle and Hollen about 1937 and the other had been destroyed by fire in 1936. There are no houses on the farm at the present time and the barn now constructed thereon is at a location considerably distant from the site of the two houses and is of recent construction.

11. In the deed to Hollen and Pyle for the property from D. R. Blackburn et ux., dated March 25, 1937, Deed Book vol. 2566, p. 249, there is no specific mention of the right to free water referred to in the deed from

6

Black to the Suburban Water Company, but the deed does contain the following provision:

"The grantors herein hereby grant, convey and assign—all right, title and interest—to any rights-of-way leases—as appurtenant to the real estate or tract of land hereinabove described . . ."

12. The tap installed or connected to the main in 1943, running to the present barn of Pyle and Hollen was installed by the Suburban Water Company following an argument between Mr. Gordon, its representative at that time, and plaintiff Pyle, whereby Pyle insisted he was still entitled to free water by virtue of the agreement for the laying of the line made by his predecessor, Robert Black. There was no new agreement between Pyle and the Suburban Water Company at that time for free water.

13. There is no other supplier of water in the general vicinity of plaintiffs' properties, although there are wells sunk upon other properties and being used by the occupiers of other properties. There are also springs in the general vicinity and there are springs and creeks upon the 108-acre tract of plaintiffs Pyle and Hollen. No wells have been drilled upon the properties of any of plaintiffs to determine whether or not adequate water can be secured from that source.

14. In November 1946 defendant placed a meter on the 7,000-foot section of line, aforesaid, to measure the amount of water passing through the line, the results of which were as follows: From November 14, 1946, to November 5, 1947, 1,258,180 gallons of water passed through the meter, of which amount 139,000 gallons were paid for by plaintiffs Grimensteins and Yeagers and no payment made by any one for the balance. The amount received for the 139,000 gallons was $60.86. Pyle and Hollen used at least 200,000 gallons of unpaid for water and the balance is unaccounted for, except by leakage.

15. This section of main is over 50 years old and has no life expectancy. No repairs have been made to it since 1942 and the line is presently leaking in the vicinity of Plum Creek Crossing.

16. Repairs cannot be made to the main in the ordinary way, but only by replacing sections of it.

17. The main is constructed over hilly terrain which has no prospects of being developed for uses that will require water service and there is no prospect for additional consumers of water to be served by it.

18. The cost of relaying the 7,000-foot section of main referred to would be approximately $30,000, which investment should return an income of $4,500 annually.

19. On May 6, 1947, defendant notified plaintiffs in writing that it would be impossible to continue to supply water to them and that the line would be abandoned September 1, 1947.

20. On October 6, 1947, the board of governors of defendant passed a resolution to close the main and to pump no more water through it after November 3, 1947, unless plaintiffs purchased the main for the consideration of $1, without guaranty or warranty of title and entered into a contract to pay for all water pumped through a meter, to be located at the beginning of it, which plaintiffs have failed and decline to do. Notice of this resolution was served on plaintiffs on October 8, 1947.

21. Defendant has not incurred great expense in the repair of the section of line with which we are concerned but repairs and replacement are imminent and are now necessary. The condition of the line requires constant inspection to detect serious breaks that may deplete quickly the amount of water in the reservoir and jeopardize the interests and rights of other consumers receiving water therefrom.

22. The operation of the section of line to which plaintiffs are connected has been and is impracticable and would be so even though payment should be made for all water now passing through it, and there are no prospects for its future profitable operation. However, such loss is not so great as to impair the financial structures of defendant or seriously affect its general operation.

23. The authority, under resolution adopted June 21, 1946, and amended August 15, 1946, agreed with the holders of its bonds to "at all times maintain the water works system acquired from the Company, and every part thereof, in good working order and condition, and will, from time to time, make all proper repairs, renewals and replacements", and further ". . . will not sell, mortgage, lease or otherwise dispose of, or encumber said water works plant or any of the properties appurtenant thereto, except such property which, when recommended by the Consulting Engineer and by Resolution passed by unanimous vote of all members of the Board, is declared not to be essential to the proper operation of said water works system".

The consulting engineer has recommended the abandonment and the board has unanimously adopted his recommendation.

### Discussion

The main issue in this proceeding is the determination of the extent to which corporations organized and operating under the Municipality Authorities Acts may regulate their own affairs without supervision; and particularly, to what extent they may curtail their services to the public with immunity from regulation by the Pennsylvania Public Utility Commission or this court. Plaintiffs are seeking to enjoin defendant authority from discontinuing service to them from a 7,000-foot section of main constituting part of its pres-

ent water system, which discontinuance has been threatened.

Two of the plaintiffs, Pyle and Hollen, have been and are now receiving free water from the line and the other four plaintiffs are being served with water therefrom under contracts with defendant.

Pyle and Hollen, as a basis for their right to free water, rely on a contract entered into between defendant's predecessor, the Suburban Water Company, and Robert Black, dated June 24, 1897, wherein that company agreed to supply free water to Black for two houses owned by him which were erected upon a tract of land over which the company desired to construct the water main in question:

"The said grantor to have water for the use of two houses now erected on said land from the line when laid for the term of ten years or so much longer as the line remains on said ground . . ."

This constituted part of the consideration for the granting of the right-of-way by Black to the company over which the line was to be laid. Pursuant to this agreement, the line was laid over the tract in 1898. The two houses then erected upon the property have since been removed and no new houses substituted therefor and there is no promise in the agreement on the part of the company to provide water for any other use or purpose than for the two houses. The court is of the opinion, therefore, that the right to free water was terminated or at least suspended with the removal of the houses mentioned in the agreement. For this reason it is unnecessary to consider whether Robert Black's right to free water was transferable to his successors in title to the land, particularly to Pyle and Hollen, the present owners of the tract, and in the disposal of this case they shall be considered solely as members of the general public who may be prospective paying customers for water service.

After examination of all of the statutes relating to authorities of this nature which have been adopted by the legislature since and including the Act of June 28, 1935, P. L. 463, it appears that the legislature has finally clearly indicated its intention to relieve authorities of this nature from the regulations and supervision of the Public Utility Commission. Since the case of State College Borough Authority v. The Public Utility Commission, 152 Pa. Superior Ct. 363, which held that the authority of the commission under the Public Utility Law of May 28, 1937, P. L. 1053, extended to authorities, the legislature has made numerous changes in the law. That decision was rendered April 20, 1943, and states:

". . . that if the legislature had intended to deprive the commission of all power . . . it would have said so, either in section 301 (of the Public Utility Commission Act) or in the Municipality Authorities Act."

The legislature then in session immediately passed an amendment to the Act of 1935, P. L. 463, which amendment was approved May 26, 1943, P. L. 661, and wherein section 4, subsec. (*h*) of the original Act of 1935, concerning rates, was amended to read as follows:

"To fix, alter, charge and collect rates and other charges in the area served by its facilities, at reasonable and uniform rates, to be determined by it exclusively."

It also gave supervisory powers over this matter to the court of common pleas in the following words:

"The provisions of this clause shall not prohibit any rate-payer from proceeding in the court of common pleas of the county wherein the project is located, to determine the reasonableness and uniformity of rates fixed by the Authority."

It further evidenced its intention to relieve authorities of the supervision of the Public Utility Commis-

sion inferentially by its amendment to section 9 of the act, subsec. (b), wherein it provided:

"No Authority shall acquire by any device . . . any project . . . subject to the jurisdiction of the Pennsylvania Public Utility Commission, without the approval of the commission. . . ."

The present Municipality Authorities Act of May 2, 1945, P. L. 382, 53 PS §2900-Z, contains the same provision giving to authorities the exclusive right to set rates subject to suit by a rate payer in the court of common pleas to determine the reasonableness of the rate and, finally, the Act of June 12, 1947, P. L. 571, further amending section 4-B(h), gives to authorities the exclusive right to determine the services and improvements to be rendered and made in the area served, in the following words:

". . . and to determine by itself exclusively the services and improvements in the areas served: . . ."

It would, therefore, appear that the legislature has placed municipality authorities such as defendant in the same position or category as municipalities operating utilities prior to the adoption of the Public Utility Law in 1937 free from the regulations and supervision of that commission: Shirk v. Lancaster City, 313 Pa. 158. In view of this conclusion, the court must therefore limit its consideration to the authority of this court to interfere with the exercise of discretion by defendant as to what services it wishes to continue or discontinue.

The court's authority is to be found not only in the Municipality Authorities Act itself, but in the Act of June 16, 1836, P. L. 784, 790, sec. 13, 17 PS §281-282, as extended by the Act of February 14, 1857, P. L. 39, sec. 1, 17 PS §283.

An examination of the Act of 1945, P. L. 382, as amended by the Act of June 12, 1947, P. L. 571, discloses only one express grant of jurisdiction to this

court insofar as consumers are concerned and that is the provision of section 4-B-(*h*), hereinbefore referred to, giving the court, upon petition or complaint of a consumer, the right to determine the reasonableness and uniformity of the rate charged. Beyond this the act is silent, as far as our jurisdiction is concerned, except, however, in proceedings by bondholders as provided in section 6. It is therefore necessary to consider the Act of 1836, P. L. 784, as extended, to determine the extent to which the court may go to regulate or supervise the operation of the affairs of defendant corporation. Section 13 of that act reads as follows:

"The several courts of common pleas shall have the jurisdiction and powers of a court of chancery, so far as relates to:. . .

"V. The supervision and control of all corporations other than those of a municipal character. . . ."

The Act of February 14, 1857, P. L. 39, sec. 1, 17 PS §282-283, extends the act to:

"The prevention or restraint of the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals."

An examination of the many cases on the subject indicates that the court will only act to prevent unjust discrimination and unreasonableness in the establishment of rates and in the managerial affairs of the company. When the acts of a corporation, whether private, municipal or such as that with which we are concerned, viz., a child or creature of the municipality itself, the discretion of the officers in managing their affairs will not be disturbed unless the court is satisfied there is unjust discrimination or the acts are unreasonable. The matter of the exercise of discretion to serve water to some and refuse it to others was considered by the court in Reigle v. Smith et al., 287 Pa. 30, a case, in some particulars, similar to the present one.

In that case, the borough had acquired a water system and by attachment to the main conduit carrying the flow of water to the reservoir from its source four properties outside the borough were supplied. The borough refused service to a prospective consumer for various reasons, but the court states:

"The real reason for the refusal was the desire to prevent further use of water from the conduit, leading from the spring to the reservoir, by Reigle, or others who might apply."

The court there found that refusal to Reigle was an unjust discrimination, since service to other customers was not stopped, but states:

"In the present case the borough could refuse to accept any customers beyond its limits, or along the line of its service main, but so long as the privilege was granted to some it cannot be refused to others."

Also in Kearney v. Borough of Westchester, 199 Pa. 392, it is inferred that a municipality operating a public utility may terminate service if done in good faith, the court there saying:

"If the borough in good faith, and not with the purpose to defeat the plaintiff's right, desires to make such changes in its water works as will require the abandonment of this pipe, there is nothing in this decree to prevent it from so doing."

Even in those instances wherein the Public Utility Commission has the power to determine when service shall be extended, the matter of reasonableness is an important consideration and the demand for an adequate return or the assurance of such on the investment is not unreasonable: Johnstown Water Co. v. Public Service Commission, 107 Pa. Superior Ct. 540; Riverton Consolidated Water Co. v. Public Service Commission, 105 Pa. Superior Ct. 6, in which case Linn, J., stated:

"While the commission will not interfere with the reasonable exercise of a water company's managerial discretion as to the method of constructing its facilities, it cannot agree that public water service under facts such as here presented may properly be withheld until such time as the community is able to produce a return, etc."

In the present case the evidence fails to disclose any possibility of the line in question ever affording adequate return on its original investment or on its replacement cost or on the investment required for adequate repairs. The line has been installed over 50 years, during which period there have been only two paying customers secured, plus one additional whose application for service was rejected due to the contemplated abandonment of the line. There is only one other prospect and that is Pyle and Hollen, plaintiffs, who have been receiving free water. Defendant has been receiving from the present paying consumers payment for only one tenth, approximately, of the water entering the main, according to the test meter it applied at the terminus of the line, the balance of the water either being consumed by Pyle and Hollen or by being dissipated through leaks in the line. The line is in need of repair and repairs are difficult and can be made, for the most part, only by replacement of sections of the line. There is ever present the danger of serious break dissipating the supply of the main reservoir if undetected, which will compel constant inspection by defendant. Dissipation of the water from the reservoir will in turn endanger the lives and property of other consumers, and the financial loss through inspecting, maintaining, and supplying water to the present and possible consumers of water from the main will impose an additional unwarranted burden upon the other customers of the authority. Under these circumstances, it cannot be said that the exercise of the

managerial discretion of defendant to discontinue service from this part of their system is unreasonable and it cannot be said to be unjustly discriminatory because it will be effective against all consumers or prospective consumers on this part of the system. The reasonableness of defendant in exercising its discretion is further exemplified by its offer to continue serving plaintiffs if they will assure it, not a fair return for its investment or which the line might rightfully be expected to give, but of payment only for the actual amount of water that passes through the meter at the terminus of the line. In other words, plaintiffs may still have service if they will assume ownership of this line and give assurance that payment will be made for all water passing through it. This will, of course, impose upon plaintiffs a greater expense for water but the continuance of service through the line is for their benefit and balancing the equities between them and other consumers of the system, it is more equitable that they should stand that burden than the others. Such additional charges have been approved in other cases. See Ambridge Borough v. The Pennsylvania Public Utility Commission, 137 Pa. Superior Ct. 50.

Undoubtedly, discontinuance of service will be a hardship to plaintiffs Yeagers and Grimensteins and those receiving water under their contracts, but such hardship will not be greater than that suffered by other people living in outlying rural areas not serviced by public water companies. As to Pyle and Hollen, they have been accepting large quantities of water for years without charge from this line and should have known that it was being accepted without right. They are, therefore, not in a very advantageous position to ask equity to compel continuance of such an arrangement.

There is one other matter that should be given consideration and that is the contract between defendant

authority and its bondholders in the form of a resolution adopted June 21, 1946, and amended August 15, 1946, which requires that defendant will not dispose of any part of its system, except upon recommendation of the consulting engineer and by resolution passed by unanimous vote of all members of the board declaring same not to be essential to the proper operation of the system. This requirement has been met, the evidence indicating that Mr. Bottleson, the consulting engineer, made the recommendation for the action and that a resolution adopting the recommendation was carried by unanimous vote of the board.

Due to the novelty of the questions involved the settlement of which will be enlightening to defendant, the court feels it only equitable to have the costs paid by it.

### Conclusions of Law

1. The decision of defendant authority to discontinue service in the 7,000-foot section of line extending from a point in Penn Township near the Borough of Verona to a point at or near the properties of Yeager, Pyle and Hollen is not an unreasonable or unjustly discriminatory exercise of its managerial discretion.

2. The action to discontinue service and dispose of the 7,000-foot section of line, hereinbefore mentioned, does not violate any agreement between defendant and its bondholders.

3. This court has no jurisdiction to enjoin defendant from exercising its judgment to discontinue service to plaintiffs and in offering to plaintiffs the alternative of accepting ownership of the line and paying for all water supplied by defendant through it.

4. John E. Pyle and Donald T. Hollen have no present enforcible right to water service either with or without charge.

5. The costs should be paid by defendant.

*Decree Nisi*

And now, to wit, July 9, 1948, this proceeding having come on to be heard, and upon consideration of all the evidence, the requests for findings of fact and conclusions of law filed by both plaintiffs and defendant and of the briefs filed by counsel for the respective parties, it is ordered, adjudged and decreed nisi as follows:

A. The injunction prayed for in the bill of complaint is hereby refused and the bill of complaint be and is hereby dismissed.

B. Defendant is to pay the costs.