Yezioro *v.* North Fayette County Municipal
Authority, Appellant.

Argued April 14, 1960. Before RHODES, P. J., GUN-THER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONTGOMERY, JJ.

*Charles E. Thomas,* with him *Paul V. Mahoney,* and *Hull, Leiby and Metzger,* for North Fayette County Municipal Authority, appellant.

*Samuel J. Feigus,* for appellees.

OPINION BY RHODES, P. J., September 20, 1960:

This is an appeal by the North Fayette County Municipal Authority[1] from a final decree of the Court of Common Pleas of Fayette County enjoining and restraining the authority from discontinuing water service to several consumers.

---

[1] Organized under the Municipality Authorities Act of May 2, 1945, P. L. 382, as amended, 53 PS §301 et seq.

On December 2, 1957, several individual consumers instituted a complaint in equity against the authority and against the School District of North Union Township under section 4 of the Municipality Authorities Act of May 2, 1945, P. L. 382, as amended by the Act of October 7, 1955, P. L. 671, 53 PS §306 B (h). The consumers sought to compel the authority to continue to provide water service to them through a water line owned by the school district to which their individual service lines are connected.

The controversy arose when the school district requested the authority to discontinue service to the school building supplied by the school district line. The authority proposed to discontinue service to the individual consumers as well, unless one or all of them accepted responsibility for the line previously controlled by the school district. The individual consumers refused this responsibility. The present action was instituted to forestall the impending cessation of service.

The school district line was constructed in 1927 to provide water to the Youngstown School. The line runs for a distance of approximately 1,500 feet from the Youngstown School to its point of connection with a distribution main of the authority. Near the point where the school district line connects with the distribution main a meter was installed to measure the water supplied to the school district. At the time of this connection the water company was privately owned. At various times from 1952 through 1954 the school district granted permission to several individuals to tap on the school district water line, and the private water company provided this service upon separate applications of the consumers. The water company metered the consumption of the various individuals with one exception. The individual consump-

tion was deducted from that registered on the school district meter to determine the consumption billed to the school district.[2] The individuals paid for the water metered at their premises.

In May, 1956, the school district requested the authority to discontinue service to its private line, and the authority notified the individual consumers that it would discontinue service unless one or all of them assumed the responsibility for the private line. Pending possible settlement of the matter the school district withdrew its request for discontinuance of service, but reinstated it on December 1, 1957. The consumers then instituted this action to enjoin the school district and the authority from discontinuing their water service.

The consumers also sought by their complaint to have the school district transfer the water line to the authority and to have the authority maintain and repair the line.

---

[2] In October, 1952, the school district granted permission to D. L. Matthews, one of the plaintiffs, to tap onto the school district water line. Matthews applied for and was granted service by the private water company. Matthews constructed a line approximately 525 feet long from his residence to the Youngstown School. In October, 1954, Matthews granted permission to Joseph Cabot to obtain water from Matthews' private line for use in a storeroom occupied by the plaintiff Yezioro. This plaintiff applied for and was granted water service by the private water company. In October, 1954, the school district also granted permission to Joseph Cabot to tap onto its private line to supply water to premises now occupied by plaintiffs Steve Utlack and Jennie Utlack. This line runs from the premises a distance of approximately 745 feet to its point of connection with the school district's line, and the application for this service was granted by the private water company. The plaintiffs Walter and Thelma Yezioro also receive water at their residence through a line near the Youngstown School. They have no meter, and apparently this connection was made without application to the authority or its predecessor private utility company. The water used in the past in these premises has therefore been paid for by the school district.

After hearing, the court filed an extensive adjudication in which it made findings of fact, discussed in detail the merits and contentions of the parties, and arrived at conclusions of law. The case was treated as one involving an attempted abandonment of service by the authority. The court concluded that the legal requirement of reasonable and adequate service compelled the authority to continue supplying water to the consumers by means of the existing school district line, and that a meter was to be installed to measure the consumption at the Yezioro residence which previously had not been metered. Accordingly, a decree was entered enjoining the authority from discontinuing the service.

The school district filed a consent of record to the continuing use of its water line for the benefit of these consumers and other members of the public upon condition that the school district should not be liable for the payment of any water or for the cost of maintenance, repair, upkeep, or replacement. The Yezioros filed their consent to the installation of a meter on their premises.

The exceptions to the adjudication filed by the authority were dismissed and a final decree entered. This appeal followed.

On this appeal the authority contends (1) that the authority is not under obligation to continue furnishing water to individual consumers through a privately owned water line which is no longer used to render service to the owner of the line; (2) or that, assuming the obligation to continue rendering service exists, the court erred in this case in requiring the continuation of service through a pipe line alleged by the authority to be inadequate, in poor condition, and not economically feasible to replace.

A municipality or municipal authority owning and operating a water system acts in a proprietary rather than governmental capacity. In the ownership and operation of such facilities it stands on the same basis as a private corporation. *Hamilton's Appeal*, 340 Pa. 17, 20, 21, 16 A. 2d 32. A municipal authority has the privilege of fixing and receiving reasonable and uniform rates for the service which it provides, and it has the obligation to render adequate, safe, and reasonable service. *Hamilton's Appeal*, supra, 340 Pa. 17, 20, 21, 16 A. 2d 32; Act of May 2, 1945, P. L. 382, §4, as amended by the Act of October 7, 1955, P. L. 671, 53 PS §306 B (h). The purpose of the Legislature in authorizing the creation of a municipal authority was "to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity, . . ." Section 4 A of the Municipality Authorities Act of 1945, as amended, 53 PS §306 A. By an amendment of 1955,[3] the authority is given the power "to determine by itself exclusively the services and improvements required to provide adequate, safe and reasonable service, including extentions thereof, in the areas served: . . . Any person questioning the reasonableness or uniformity of any rate fixed by any Authority or the adequacy, safety and reasonableness of the Authority's services, including extentions thereof, may bring suit against the Authority in the court of common pleas of the county wherein the project is located, . . . The court of common pleas shall have exclusive jurisdiction to determine all such questions involving rates or service."[4] The burden of

---

[3] Act of October 7, 1955, P. L. 671, 53 PS §306B(h).

[4] Prior to the present Municipality Authorities Act, municipally owned water companies were subject to the regulation and control of the courts of common pleas under the court's broad chancery powers. *Shirk v. Lancaster City*, 313 Pa. 158, 166, 169 A. 557. "The

proving that the services of the authority are not adequate, safe, and reasonable appears to rest upon the consumers bringing the action in the court of common pleas. *Rankin v. Chester Municipal Authority*, 165 Pa. Superior Ct. 438, 449, 68 A. 2d 458.

What amounts to adequate, safe, and reasonable service is generally not capable of definition with precision. The duty of the hearing tribunal is to determine, from all the relevant facts and circumstances indicated by the substantial evidence, whether the service provided is adequate, safe, and reasonable for the consuming public. *Colonial Products Company v. Pennsylvania Public Utility Commission*, 188 Pa. Superior Ct. 163, 169, 170, 146 A. 2d 657.

The consumer complaint in this case is not the usual type service complaint in the sense that the existing service is not alleged to be inadequate or unreasonable; rather, it relates to the complete discontinuance and abandonment of the existing service with which the consumers are apparently satisfied. Although the Municipality Authorities Act, in section 4, 53 PS §306, makes no specific reference to abandonment of service, the issue of the abandonment of service may properly be raised in a complaint questioning the adequacy and reasonableness of the authority's service as outlined in the Act.

It is clear that the authority is not relieved of its obligation to provide service to these consumers simply because the private line to which they are connected is no longer used to serve the owner of the line. As the court below found, when the authority acquired, in

---

action of the municipal board [water board] is subject . . . to the control of the courts where it discriminates or acts unreasonably . . ., as is a private water company to the orders of the Public Service Commission." *Reigle v. Smith*, 287 Pa. 30, 35, 134 A. 380, 381.

April, 1956, the franchises, equipment, and other assets of the private water company, it assumed all the contracts and obligations to supply water to consumers in the area served by the predecessor company. That obligation did not cease merely because the school district no longer desired water service at the Youngstown School. The private line of the school district, while remaining its private property and not the property of the predecessor water company or the authority, was and is nevertheless a facility of the water company and the authority in so far as the consumers who have been permitted to obtain water from this line are concerned. *Overlook Development Company v. Public Service Commission,* 101 Pa. Superior Ct. 217, 224. The obligation of the authority to continue rendering service to the consumers on this line does not depend upon the authority's ownership of the line, but does arise from the obligation of the predecessor water company acquired by the authority and from the fact that, as to these consumers, the private line is a facility of the authority. The court below properly concluded that the private ownership of the line is not, in itself, an excuse for the cessation of providing adequate service so long as the line remains available for use by the authority in furnishing service to these consumers. As we have indicated, the school district has filed a consent of record permitting the use of this line not only by these consumers but by the general public as well. See *Overlook Development Company v. Public Service Commission,* supra, 101 Pa. Superior Ct. 217, 225.

The exonerative language in the service applications made by the consumers to the predecessor utility cannot be held to mean that the predecessor utility could have discontinued the service then, or that the authority may discontinue the service now, in its sole discretion. The abandonment of service may not depend

solely upon private agreements. See *Wattsburg Telephone Cooperative Association v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 594, 600, 128 A. 2d 160.

Since the abandonment of service cannot be justified solely on the basis of the private nature of the line, we turn now to a review of the court's determination that on the facts of the case the cessation of service would deprive the consumer of adequate and reasonable service contrary to the provisions of the statute.

The decree enjoined the authority from discontinuing the existing service to the plaintiff consumers, but it did not require the authority to acquire ownership of the school district line.

The net effect of the court's decision was to require the authority to continue rendering the same service as it had rendered in the past with the sole exception that the line losses, determined upon the present state of the record to be de minimis or not so substantial as to warrant abandonment of service, shall be absorbed by the authority rather than the school district, at least until actual experience proved the loss was significant. In this regard, it was ordered that the school district master meter be retained in order that the actual amount of line loss could be determined. The court retained jurisdiction of the case for the purpose of ascertaining what repairs or replacements should be made in the event that the line loss or leakage becomes excessive or the line unserviceable.[5]

---

[5] The court said: "The Court will retain jurisdiction of the case for the purpose of determining what is proper in the event that this leakage should appear to be unduly excessive, or if the lines become unserviceable. At the present time, the Court is inclined to regard this loss as one to which the rule de minimis applies, or at least as one which has not been shown to be so substantial as to warrant abandonment or cessation of service."

The authority engineer testified that the water unaccounted for, presumed due to line losses or leaks, amounted to 84 per cent in the first quarter of 1958. An exhibit prepared by the engineer purported to indicate that the leaks or line losses were 53 per cent in 1956, and 76 per cent in 1957. The line loss, however, could not be determined with certainty, as the court below found, because of the fact that the Yezioro residence did not have a meter to determine its consumption. We note that the water authority engineer testified that the authority has equipment which would locate the place or places of leakage with some degree of certainty, but that such tests had not been made in the past because the authority did not own the line. The engineer also stated that "normal" line loss or leakage in the average water works system is from ten per cent to twenty-five per cent and is passed on to the consuming public as a cost of production. We think it was proper, under the circumstances, for the court below to hold in abeyance the question of whether the actual leakage was unduly excessive and whether the line was actually unserviceable. Certainly the line did not become unserviceable simply because the school district no longer takes water at the Youngstown School.

The court found that requiring the authority to continue this service did not result in a loss sufficient to overcome the duty of rendering service.

In arriving at this conclusion the court considered our statement in *Commuters' Committee v. Pennsylvania Public Utility Commission*, 170 Pa. Superior Ct. 596, 604, 605, 88 A. 2d 420, concerning the criteria determinative of the propriety of an abandonment of service and certain of the factors to be considered. These include the extent of the utility's loss in the particular portion of the service sought to be abandoned

and the relation of that loss to the utility's total operation; the use of the service by the public and the prospects as to future use; a balancing of the utility's loss with the inconvenience and hardship to the public upon discontinuance of the service; and the availability and adequacy of the service to be substituted. The ultimate test is whether the loss to the utility is unreasonable under all the circumstances, giving due regard to the interests of the public as well as the utility.

On the basis of exhibit 14, submitted by the authority, the court noted that the authority's production and transmission costs per consumer average $7.72, and that for the four consumers here involved they total $30.88, as compared with the estimated revenues from service to these consumers of $130.04. This appears to have been the only evidence of the cost of service in the record. The court therefore concluded, for purposes of this case, that there would be no loss sufficient to justify abandonment of the service.

The court further found that for the year ending March 31, 1958, residential service provided revenues of $202,075 out of total operating revenue of $311,060; operating expenses were $153,088, leaving $157,972 for debt service and other funds established under the trust indenture. It is noted that the operating expenses of the authority are lower than the amount available for debt service and other funds under the trust indenture. Any loss or decrease in revenue to the authority in assuming the leakage and line loss on the school district line could formulate no good reason for the complete abandonment of service to these consumers, at least until the amount was definitely ascertained, the leaks located, and the actual serviceability of the line determined.

As we have indicated, the court in this proceeding did not direct the authority to acquire ownership of

the school district line or to permanently assume the obligation of maintenance, repair, or replacement of the line. Such obligations do not arise as a necessary implication of the court's decree. These matters were left open for hearing and determination when the matter of repair, maintenance, and replacement of line becomes material.

In this regard we observe that the principal purpose and the obligation of the municipal authority acting in a proprietary capacity are to render adequate, safe, and reasonable service to the consuming public for which it is permitted to charge reasonable and uniform rates. Generally the making of repairs and improvements to meet the duty to render adequate, safe, and reasonable service is upon the utility. While in proper cases such repairs and improvements may be ordered, even though the immediate result thereof would be a financial loss therefrom to the utility, consideration may be given to the attitude of the particular consumers involved toward participation in the cost of the improvements, particularly where the service in general is reasonably adequate and the demands of the particular consumer are unusual or extraordinary. *Colonial Products Company v. Pennsylvania Public Utility Commission*, supra, 188 Pa. Superior Ct. 163, 172, 173, 146 A. 2d 657. See *Riverton Consolidated Water Company v. Public Service Commission*, 105 Pa. Superior Ct. 6, 11, 159 A. 177.

The authority argues that, since the statute provides initially that the authority is given the power to determine "by itself exclusively the services and improvements required to provide adequate, safe and reasonable service, including extentions thereof," the court below could only review the authority's action to determine whether it was the result of bad faith, fraud, caprice, or amounted to an abuse of discretion. The

case of *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 572-574, 109 A. 2d 331, is cited. The Blumenschein case involved the review of a housing authority's exercise of discretion in choosing the location of a site for a public housing project. In our opinion that situation is not analogous to the determination of the adequacy and reasonableness of the utility service rendered by a water authority. The authority, the same as any public utility, acts in a proprietary capacity and exists for the essential and prime purpose of rendering adequate, safe, and reasonable service to the consuming public. The statute so provides. See *Hamilton's Appeal*, supra, 340 Pa. 17, 16 A. 2d 32; *Reigle v. Smith*, 287 Pa. 30, 134 A. 380. The determination of adequate, safe, and reasonable service is not a matter of discretion; it is a factual and legal determination based upon consideration of the particular facts and circumstances of the service desired, rendered, proposed, or abandoned. *Colonial Products Company v. Pennsylvania Public Utility Commission*, supra, 188 Pa. Superior Ct. 163, 169, 170, 146 A. 2d 657. Administrative discretion and policy are no substitute for substantial evidence; discretion and policy alone provide no sound reason for the avoidance of such a primary obligation as the rendering of adequate, safe, and reasonable service. *Aizen v. Pennsylvania Public Utility Commission*, 163 Pa. Superior Ct. 305, 316, 60 A. 2d 443. The statutory provision to the effect that the services provided by the authority are to be determined "by itself exclusively" must certainly have been intended to make it clear that the authority itself, not the creating municipality or some other instrumentality, controlled the initial determination of the service. But it cannot be held to mean that the court of common pleas may not make a determination of the adequacy and reasonableness of the service by application of the

usual considerations and standards when the court is called upon to do so as specifically provided in the Act. See *Ridley Township v. Pennsylvania Public Utility Commission*, 172 Pa. Superior Ct. 472, 478, 94 A. 2d 168. The Act provides that any person may question the adequacy, safety, and reasonableness of the authority's services, in which event "The court of common pleas shall have exclusive jurisdiction to determine all such questions involving rates or service." Consequently, since a consumer may question the adequacy, safety, and reasonableness of the authority's service, it necessarily follows that the court of common pleas, in which the consumer's suit is brought, has the power to inquire into the adequacy, safety, and reasonableness of the service in issue. To hold otherwise would be to nullify the right to bring suit given by the Legislature to the consumer.

In this case the court exercised its statutory duty. It considered the facts and circumstances indicating the reasonableness or unreasonableness of the abandonment of service to these consumers. The court did not simply substitute its discretion for the discretion of the authority. From all the evidence the court properly concluded that the proposed abandonment of service was unreasonable. Even if the abandonment of service were principally a matter of discretion, the facts and circumstances of this case demonstrate that the cessation of service would amount to an abuse of discretion and result from an arbitrary execution of the authority's principal duty and function.

Moreover, what the authority engineer considered "good water works practice" cannot control the determination of this case. In the exercise of the duty of determining the adequacy and reasonableness of service, the court below was not bound to accept as a criterion of adequate, safe, and reasonable service the

standard suggested by any particular participant in the proceeding. *Colonial Products Company v. Pennsylvania Public Utility Commission,* supra, 188 Pa. Superior Ct. 163, 170, 146 A. 2d 657.

The decree of the court below is affirmed subject to the retention of jurisdiction by that court; appellant to pay the costs.

DISSENTING OPINION BY WOODSIDE, J.:

I dissent.

Because I firmly believe that the decision and opinion of the majority in this case will have far reaching disastrous repercussions, I feel compelled to set forth my reasons for disagreeing and to outline my apprehensions.

First, the majority opinion commits the Commonwealth to an undesirable deviation from the accepted method of governmental regulation, by saddling the common pleas courts with detailed supervision of utility rates and services. This is an administrative problem, and is a task for which the courts are hopelessly ill-equipped.

In my opinion, the legislature did not intend the common pleas courts to interfere with the management of Authorities in the manner this Court sanctions by this case. Historically, municipalities have been free from regulation in the operation of water systems within their municipal borders except for such unreasonable conduct as would warrant relief in a court of equity under the Act of June 16, 1836, P. L. 785. *Barnes Laundry Co. v. Pittsburgh,* 266 Pa. 24, 109 A. 535 (1920).

Municipal water companies predated the public utility law, or The Public Service Company Law, as it was first called when enacted on July 26, 1913 (P. L. 1374). Except in a few relatively unimportant re-

spects, municipal corporations were exempt from its provisions.

Publicly owned and operated utilities, including water plants, mushroomed after the Supreme Court gave its blessing in the mid-thirties to the formation of Authorities. The Municipal Authorities Act of June 28, 1935, P. L. 463, and the Public Utility Law of May 28, 1937, P. L. 1053, continued the legislative policy of exempting both municipal corporations and Authorities from usual regulation. Authorities were brought within the definition of municipal corporations and were excluded from the definition of public utilities, §2 (9) (15) (17) of the Public Utility Act, supra, 66 P.S. 1102 (9) (15) (17), but their rates and services beyond their corporate limits remained subject to the jurisdiction of the Public Utility Commission. §202 (g), §301, and §401, 66 P.S. §1122, §1141, §1171. The extent of this jurisdiction, as we shall hereafter indicate, was frequently challenged in the courts by the Authorities.

When the Municipal Authorities Act of May 2, 1945, P. L. 382, replaced the Act of 1935, supra, it provided in §4B(h) that Municipal Authorities should have, among others, the following rights and powers:

"(h) To fix, alter, charge and collect rates and other charges in the area served by its facilities at reasonable and uniform rates to be determined exclusively by it, for the purpose of providing for the payment of the expenses of the Authority, the construction, improvement, repair, maintenance and operation of its facilities and properties, the payment of the principal of and interest on its obligations, and to fulfill the terms and provisions of any agreements made with the purchasers or holders of any such obligations, or with the municipality incorporating or municipalities which are members of said Authority: . . . Any person

questioning the reasonableness or uniformity of any rate fixed by any Authority may bring suit against the Authority in the court of common pleas of the county wherein the project is located, . . . The court of common pleas shall have exclusive jurisdiction to determine the reasonableness and uniformity of rates and other charges fixed, altered, charged or collected by an Authority."

It is to be noted that the courts were given jurisdiction over "rates and other charges," but not "service." In *City of Allentown v. Pa. Public Utility Commission*, 63 Dauph. 61, 72 (1952), 64 Dauphin 126 (1952), appeal quashed 173 Pa. Superior Pa. 219, 96 A. 2d 157 (1953), the court said, in holding the Authority subject to the Public Utility Commission: "unless jurisdiction in the matter of the determination of *service* is conferred upon the Court of Common Pleas, that Court could not assume such jurisdiction in derogation of the express statutory provisions of §401 of the Public Utility Law."[1] (Emphasis supplied). The numerous cases in which Authorities had previously challenged the jurisdiction of the commission were carefully and ably reviewed by Judge NEELY, now President Judge, in his comprehensive opinions cited above. See also *White Oak Borough Authority v. Pa. P. U. C.*, 175 Pa. Superior Ct. 114, 103 A. 2d 502 (1954). The Local Government Commission thereupon undertook a study of the growing supervision of Authorities by the Public Utility Commission. Out of the study came two companion bills, amending the Municipal Authorities Act, which were introduced at the next (1955) session of the legislature—Senate Bill 455 which became Act 212 (P. L. 729) and Senate Bill 456 which became Act 185 (P. L. 671).

---

[1] The Supreme Court had said the same thing in 1920. See *Barnes Laundry Co. v. Pittsburgh*, 266 Pa. 24, 30, 109 A. 535.

By the Act of October 7, 1955, P. L. 671 (Act 185, supra), §4B(h) of the Municipal Authority Act was amended to give the courts of common pleas "exclusive jurisdiction to determine all such questions involving rates *or service.*" (Emphasis ours). The "such" related to "the adequacy, safety and reasonableness of the Authority's service." Although there were other changes, "service" was the key addition to the section.

The purpose of the above amendatory acts was to further limit the Public Utility Commission's jurisdiction over Authorities. The amendment did not represent the only way this could have been accomplished, and possibly not even the best way. The same result could have been obtained by amending §202(g), §301 and §401 of the Public Utility Law. However, the Local Government Commission and the legislature were faced with the above quoted statement of the court, and understandably they followed the court suggested method of relieving Authorities from supervision by the Public Utility Law imposed by §401, supra. The basic purpose was to relieve Authorities from detailed regulatory interference and not to increase it.

The only legislative debate on the above bills indicates that both those favoring and those opposing the bills believed that they relieved Authorities of supervision. Speaking for the bills, Senator Dent, one of their sponsors, said: the purpose of the bills is to "prevent . . . crippling the services rendered by Authorities." He further said, "Senate Bill No. 456 . . . establishes specifically that the Public Utility Commission does not have jurisdiction over any services by municipal authorities . . . all this legislation does is to uphold certain court decisions which are following the basic law . . . that any services rendered must be rendered on an equitable basis. . . ." Speaking against

the bills, Senator Lane said, they give the Authorities "a blank check." Legislative Journal of August 1, 1955.

Now, let us recapitulate. Municipal water companies within their corporate borders were free from regulation by the Public Utility Commission, but subject to the general equity powers of the courts. In a case questioning the extent of the commission's jurisdiction, the court said that the Public Utility Law giving the commission jurisdiction made it impossible for the court to "assume" jurisdiction. The court was undoubtedly referring to the general equity powers of supervision which the courts would otherwise have. Thereupon, the legislature gave the courts the exclusive authority to pass upon the reasonableness of rates *and services*. This was for the purpose of restoring to the courts the powers which they would have had except for the Public Utility Law. It was not to make public utility commissions out of the courts of common pleas in the sixty-seven counties. It was not to further limit the Authorities' powers to manage their plants. The extent of the Authorities' power, or the limit of the courts' review is, therefore, not to be governed by the cases dealing with the Public Utility Commission's regulation of public utility companies, but by the cases dealing with the powers of the courts over municipal corporations, including Authorities.

The court below suggested that an Authority should be held to a stricter degree of accountability by the courts than a public utility company is held by the commission.[2] This is obvious error. The majority equated the review of municipal corporations by the court with the review of public utility companies by the commission. I think this, too, is error.

---

[2] It suggested that the courts should place "greater . . . emphasis upon the needs of the public for adequate service than the Public Utility Commission."

In *Barnes Laundry Co. v. Pittsburgh,* supra, 266
Pa. 24, 36, 37, 109 A. 535 (1920), the Supreme Court
reaching the conclusion that "the legislature did not
intend to subject municipal corporations, rendering
the same character of service as public service com-
panies, to like regulation with the latter," said, "When
rendering the same character of service as public serv-
ice companies, municipalities for many purposes must
be considered and treated like private corporations . . .
but, *for purposes of supervision over their internal
management, . . . it can readily be seen they may justi-
fiably be put on a different basis from ordinary public
service companies;* for, though engaged in rendering
the same kind of service as the latter, and entitled to
derive therefrom a just gain . . ., municipalities are sup-
posed to act primarily for the public good—not to earn
dividends; moreover, they are financed along quite dif-
ferent lines from other corporations, and managed by
popularly elected officers, who, as just said, are pre-
sumed to act for the public weal, and, when they fail
to do so, may be turned out by their constituents at
stated intervals:" (Emphasis supplied).

By nature and function as well as by definition in
the Public Utility Law, an Authority is the same as a
municipal corporation in that it is a corporation of a
public character organized by a municipality to render
a public utility service. *State College Borough Au-
thority v. Pa. P. U. C.,* 152 Pa. Superior Ct. 363, 375,
31 A. 2d 557 (1943).

Our Supreme Court has recently said: "By a host
of authorities in our own and other jurisdictions it has
been established as an *elementary principle of law that
courts will not review the actions of governmental
bodies or administrative tribunals involving acts of
discretion, in the absence of bad faith, fraud, capricious
action or abuse of power;* they will not inquire into

the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion." (First emphasis supplied). *Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 572, 573, 109 A. 2d 331 (1954).

See also *Hyam v. Upper Montgomery Joint Authority,* 399 Pa. 446, 160 A. 2d 539 (1960) ; *Parker v. Phila.,* 391 Pa. 242, 249, 137 A. 2d 343 (1958) ; *Eways v. Reading Parking Authority,* 385 Pa. 592, 597, 124 A. 2d 92 (1956) and two lower court opinions written by able judges—*Mistick v. Monroeville Water Authority,* 108 Pitts. L. J. 76 (1959) and *Pyle v. Oakmont Municipal Authority,* 70 Pa. D. & C. 1 (1948).

The courts cannot possibly acquire the knowledge, the experience, the statistical information nor the staff to fairly and effectively regulate Authorities in the manner of a Public Utility Commission.[3] Think of the time which ultimately will be consumed by already busy courts in dealing with minute problems of rates and services, and the inconsistencies bound to develop

[3] The judge who heard this case and wrote the opinion for the court below is a *good* judge and his exhaustive opinion is evidence of his usual prodigious efforts to conscientiously carry out his official duties. But, as must be expected, he does not demonstrate a familiarity with accepted utility problems, practices and laws, which, I believe, might have led him to a different conclusion.

out of the courts of 67 different counties dealing with problems which are basically not legal but administrative.

There are many cases dealing with the difficult problem of drawing the line between the exclusive managerial discretion of public utility companies' services and the commission regulation of the company's service problems. I can find no case where the courts or the commission assumed a greater degree of administrative supervision than has the court in this case.

But completely aside from the *extent* of the jurisdiction which the courts should assume over the service problems of Authorities, in my opinion, *the action of the Authority in the matter before us was the only proper action for it to take.*

The defendant operates a water system in a rural community. There are many areas in all rural communities which neither publicly nor privately operated utility companies can serve at the established rate without suffering a loss which would have to be borne ultimately by the other customers who should not be required to pay for the extension of the system into these sparsely occupied areas. Within the unserviced areas, there may be those who, for reasons of their own, are willing to expend a substantial sum to obtain utility service at their remote and isolated place. Of course, such people should not be denied service for which they are willing to pay fair compensation. From this situation developed the practice of furnishing service to private lines by publicly and privately owned water, sewer, electric, and telephone systems. This practice, as old as utility companies themselves, is being applied extensively today. Many agreements to supply utility service, although varying in detail, follow the basic pattern of furnishing the service to private lines. The municipal corporations and the util-

ity companies assume no responsibility beyond the point where the company system joins the private line. This universally accepted practice is encouraged by the financing methods of both the privately and publicly owned utility companies.[4]

I refer to this practice because I think the decision in this case strikes at its very heart, and if the decision is followed in other cases, it will create chaos in the utility field.

The evidence in this case shows the defendant did exactly what it should have done. The Authority had furnished water to a private line owned by the school district which assumed responsibility for the line and paid for all of the water furnished to that line by the Authority. The school district allowed, with doubtful legal authority, the plaintiffs to tap the line, and the plaintiffs, the school district and the water company agreed that the water used by those tapping the line should be metered and paid for by them and that all of the balance of the water going into the private line should be paid for by the school district. One of the plaintiffs has been receiving water without it being metered and without paying anybody for it. We might parenthetically note that by this illegal act he has apparently gained the right to become a party and win an award in this case.

When the water company here agreed to meter the tapped water and separately bill the users, the tappers agreed that the water company would not be liable for discontinuance of service. The school district has discontinued use of the building to which the line furnished water and has abandoned the line. The water

---

[4] It would unduly prolong this opinion to demonstrate this, but it involves, among other considerations, the limited funds available to small companies for capital construction and the difficulty of frequently borrowing relatively small sums for such extensions.

company offered to continue service to the private line if the remaining users would pay for the water furnished. This followed the accepted procedure when a private line is being used by more than one person and one of the users discontinues his use of the line. Of course, the remaining users should take over the line. But here they refused, and brought this action.

The majority treats this as an abandonment of service case. It is not. The Authority asks no change in what it has been doing. It furnished water to a private line for which it was paid at its regular rate on the basis of a metered amount of water which went into that line. It offers to continue to furnish water to that private line for which it asks to be paid as heretofore. The remaining users of the private line refused to pay for the water that goes into it. With no person willing to pay for the water being taken from its water system, the Authority properly threatened to discontinue the supplying of the water for which the parties would not pay. It is the only proper decision it could make.

The court found that the present line was approximately 1500 ft. long, from 1½ to 2 inches in diameter, badly tuberculated, and would cost $13,860 to replace with pipe of accepted water company standards; that it is in a rural area in which there is very little hope that any new customers will be found; that the company has over 200 private lines, up to 5000 ft. long, constituting a total of 42 miles of private lines against 154 miles of its own lines. According to the evidence, unaccounted for water which entered this private line has increased from 53% in 1956 to 84% in 1958. Because some of the missing water was illegally taken by one of the plaintiffs, the exact loss by leakage cannot be ascertained, but it seems to be abnormally high. The loss in this 1500 ft. line, whether it be 84%, 76%, 53% or even less, cannot properly be compared with

the "normal" loss in a whole water system, which is stated as from 10% to 25%. If every 1500 ft. of pipe in the system lost even 10% there would be no useful water in the mains long before the most distant spigot was reached.

I feel I should not prolong this dissent with a detailed analysis of the financial problem discussed briefly in the majority opinion. I must point out, however, that the suggestion by the court below and the majority here that the cost of the company to service these customers will be $30.88 and the revenue to be received will be $130.04 annually is misleading. In the first place, the $30.88 item represents an average customer cost of production and transmission which itself completely ignores all collection costs, general administrative costs and bond and interest payments which represent items far in excess of production and transmission costs singled out by the court to make up the $30.88. There is evidence in the record that the annual loss of serving these customers will exceed $950, assuming a replacement cost, which will be necessary in the near future. The evidence shows that in 1957, $340.16 was paid for the water furnished to the private line, which was the accepted rate, and presumably fair. Of this, the four tappers paid a total of $102.69 and the school district paid the balance of $237.47, most of which was for water leaking from the private pipe.

The court below and the majority here are of the opinion that the court should continue its supervision over this water line. The record does not justify a decree in favor of the plaintiffs, but it is suggested that a different set of facts[5] might develop and by continuing

---

[5] It is suggested that it may develop that the leaks are not so extensive as the record indicates or that they can be fixed or that the pipe is not as tuberculated as the record shows and will not require replacement.

jurisdiction, the decree, now entered as "final", might find supporting evidence. But, the mere fact that the court must continue to supervise this line emphasizes why the court should not have assumed regulatory jurisdiction at all. By its decision and opinion, the court now has involved itself indefinitely in determining the amount of water going into the line, the price being paid for it, the future testing for leaks, the future repairs of the line, the future replacement of the line, and the future ownership of the line. And we might add that the court cannot properly supervise one of the 200 private lines without any knowledge of the problems involved in the other 199, and how these problems should be solved. Are the 199 private line owners to pay for servicing, repairing and replacing their own private lines and also help pay for similar service to the private line serving the plaintiffs? Or must the company take over all 42 miles of private lines where only 2% of the water is consumed, and thus increase its line mileage by approximately 27%? If it must do this, will not this action depreciate the value of the bonds, violate the bond agreement, and unduly increase the cost of service to the subscribers?

It is said that the decree does not require the Authority to acquire ownership of the school district line. Whose line is it? The school district has abandoned it. The majority call it a "facility of the water company." In *Overlook Development Co. v. P. S. C.,* 101 Pa. Superior Ct. 217 (1931), cited by the majority, the court held even though a private line was a "facility" of the water company under a statutory definition of the word, a commission order directing the water company to serve a customer from the private line was error.

The decree here requires the defendant to deliver water, not *to* the line but *through* it to the properties of

the plaintiffs. The opinions suggest that the Authority should use its equipment to locate leaks. The Authority cannot comply with the decree without keeping the pipe in sufficient repair to deliver water through it to the plaintiffs. If water leaks out of it, the Authority must stand the loss. The Authority may not have any of the rights of ownership, but it has all the liabilities of ownership.

The decision in this case is bad for the courts, for the Authorities and for municipal corporations in that we attempt the solution of administrative problems which should be left to the Authority. Unfortunately, the evil effects of this Court's decision will not end there.

In the rural areas of this Commonwealth there are many thousands of private water, sewer, telephone and electric lines to which municipal corporations and public utility companies furnish service under circumstances substantially similar to the arrangement that the Authority had here with the school district. There have been, and will continue to be, an unlimited number of cases where it would be beneficial to all concerned to have these private lines tapped by those who build along them. But, after learning of the opinion in this case, what utility company or municipal corporation will agree to having a private line used by other than the owner of the line? By the Authority here having agreed to the tapping of a private line, it is being required to furnish water over 1500 feet from its own lines. The Authority cannot do this without "taking over" the private line—in this case an old worn out line into which is going water only 16% of which was being paid for when the order was made.

*This decision establishes beyond any question the principle that after a private water line is abandoned by its owner, the water company must continue to furnish water to a person who had tapped that private*

*line.* It is even applied here in a case where the line is comparably very long, admittedly in *very* poor condition, where one of the plaintiffs was improperly receiving water for which he never paid, and the other plaintiffs agreed when they first received the water that the water company could discontinue service. It can never be argued that this case should be limited to its particular facts, for it is difficult to conceive of any situation where there could be so many different reasons to justify the action taken by the Authority, and where there would be so few reasons to justify the court's action.

But the evil of this decision will not end there. Municipal corporations and public utility companies furnish service to housing developments under a great variety of agreements. The efficacy of all these agreements is threatened by the decision in this case. This Court now holds the agreements here made may be voided by the customers at will. If by virtue of this opinion, utility companies and municipal authorities are required to furnish service to each individual along a private line at his own property regardless of previous agreement or practice, it will require a revaluation of the whole ultility system of furnishing service under special agreements.

There are numerous instances where water companies and other utilities furnish service *to* private lines, and we should not endanger this system for the sole purpose of giving four customers water at a rate less than they should pay for it.

I would reverse, first because the action of the Authority in this case should have been held by the court to be within the Authority's discretion, and secondly, because the action was proper, even if it were one whose merits must be passed upon by the courts.

MONTGOMERY, J., joins in this dissent.

ERVIN, J., joins in the second point.