637 A.2d 662

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Petitioner,

v.

UNION SWITCH & SIGNAL, INC., Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 1993.

Decided Jan. 14, 1994.

Victor P. Stabile, for petitioner.

George D. Wenick, for respondent.

Before DOYLE and PELLEGRINI, JJ., and RODGERS, Senior Judge.

PELLEGRINI, Judge.

The Southeastern Pennsylvania Transportation Authority (SEPTA) appeals from an order of the Board of Claims denying its motion to dismiss for lack of jurisdiction because the Board of Claims determined that it had exclusive jurisdiction to hear a contract claim filed against SEPTA by Union Switch & Signal, Inc. (Union Switch).

On January 23, 1989, Union Switch and SEPTA entered into a contract by which Union Switch agreed to supply and install electrical equipment and material for power and signal systems as part of the construction of the Broad Street Subway Express Tract. The contract established that SEPTA would pay Union Switch $5,500,000 for the work and set the completion date of the project at May 1, 1990. The project, however, was not completed until December of 1991.

Union Switch filed a complaint against SEPTA on March 20, 1992, with the Board of Claims seeking payment of over $5,000,000 for costs it incurred due to SEPTA's alleged delay, disruption and inefficiency of the project, as well as attorney's

fees.[1] It filed the complaint with the Board of Claims because pursuant to Section 4 of the Act of May 20, 1937 (Board of Claims Act), P.L. 728, *as amended,* 72 P.S. § 4651–4, the Board of Claims has exclusive jurisdiction over actions arising from a contract with the Commonwealth when the amount of the controversy exceeds $300. Union Switch reasoned that while "Commonwealth" is not defined in the Board of Claims Act, an entity is the Commonwealth for purposes of deciding jurisdiction if it enjoys sovereign immunity. Because SEPTA, as a transportation authority, is an "agency and instrumentality of the Commonwealth" and enjoys sovereign immunity from tort liability under Section 8521 of the Judicial Code, 42 Pa.C.S. § 8521, Union Switch concluded it follows that SEPTA is the sovereign for all purposes, including contract claims. As such, the Board had jurisdiction over this action.

SEPTA responded by filing preliminary objections in which it requested, *inter alia,*[2] that the Board of Claims dismiss Union Switch's complaint because it lacked jurisdiction to hear the matter. Specifically, SEPTA argued that while the Board of Claims has exclusive jurisdiction to hear all claims against the Commonwealth arising from contracts where the amount in controversy is $300 or more, SEPTA is not the "Commonwealth" for purposes of contract claims. Consequently, jurisdiction is not with the Board of Claims but with the Court of Common Pleas in the county in which SEPTA can be served that has jurisdiction over this matter.

1. In Count I of the complaint, Union Switch alleged that it was owed in excess of $4,000,000 for delay damages resulting from SEPTA's untimely design changes and delay of authorization of the changes. Counts II and III of the complaint alleged that approximately $850,000 was owed to Union Switch for nonpayment of approved extra work. Count IV alleged that Union Switch was owed $75,000 for repairing or removal and replacement of signal cables and related work. Count V of the complaint alleged that SEPTA had not paid Union Switch $422,641, the remaining balance of its contract obligation.

2. In its preliminary objections, SEPTA also requested the Board of Claims to order Union Switch to more specifically plead various paragraphs in its complaint, to strike the complaint for lack of conformity to law and rule of Court, and to strike Union Switch's request for attorney's fees because the contract did not authorize the payment of attorney's fees.

The Board of Claims denied SEPTA's request to dismiss for lack of jurisdiction finding that SEPTA is an agency of the Commonwealth,[3] and in the absence of an appellate court decision holding that the Board of Claims does not have jurisdiction to entertain contract claims against SEPTA, it would assume jurisdiction of those matters.[4]  SEPTA filed an application with the Board of Claims requesting that it amend its decision and permit certification of the issue of the Board of Claims' jurisdiction to this court.  The Board of Claims granted SEPTA's application and amended its order to permit SEPTA to seek interlocutory review of the jurisdictional question.  SEPTA then petitioned this court for permission to appeal the Board of Claims' order which we granted.

The only issue before this court is whether SEPTA is considered to be the "Commonwealth" for purposes of determining jurisdiction when contract claims are filed against it with the Board of Claims.  If SEPTA is part of the Commonwealth, then contract claims against it must be filed with the Board of Claims.  If it is a local agency, then contract claims filed against it must be filed with the Court of Common Pleas in the county in which SEPTA can be served.  The resolution of this issue is important not only because it will determine jurisdiction of contract claims filed against SEPTA or, for that matter, against all authorities, but it will also define whether non-contract and non-tort actions against SEPTA are in this court's original jurisdiction (rather than in the Court of Common Pleas), with the attendant automatic appeal of right from this court to our Supreme Court.  *See* Pa.R.A.P. 1101(a)(1).[5]

3.  The Board of Claims also indicated that it would entertain jurisdiction over all authorities because they were all "agencies of the Commonwealth."  (Board opinion, p. 4).

4.  The Board of Claims also denied SEPTA's request to order Union Switch to more specifically plead various paragraphs in its complaint and to strike the complaint for lack of conformity to law and rule of Court.  It did, however, grant SEPTA's request to strike Union Switch's request for attorney's fees finding that the fees exceeded a recovery to which Union Switch was entitled.

5.  This rule provides that it applies to any appeal to the Supreme Court from an order of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court and which

■ The difficulty in determining the status of SEPTA or, for that matter, any authority, is directly related to the reasons behind their creation and authorization by the General Assembly. Although authorities owe their existence to the various units of government and their governing boards are appointed by those entities, they are not considered part of the normal governmental structure. Unlike municipal corporations that have "governmental" and "proprietary" functions, authorities engage only in the latter. Authorities are "public corporations, being corporate agencies engaged in the administration of civil government." [6] *Lighton v. Abington Township*, 336 Pa. 345, 353, 9 A.2d 609, 613 (1939). Generally, authorities are established for the purpose of financing and managing various revenue producing projects of a public nature or other activities that are not considered to be part of core governmental activities; they are a governmental business venture, a form of quasi-privatization. The circumstances prompting their creations are usually for one or more of the following reasons:

· the need for an administrative agency to manage public enterprises which, in certain case, have commercial characteristics, e.g., Metropolitan Transportation Authorities (SEPTA); Parking Authorities;

does not constitute an appeal to the Commonwealth Court from another court, a district justice or another government unit.

**6.** There are a number of statutes authorizing the creation of authorities. Most authorities are formed under the Municipal Authorities Act of 1945, Act of May 2, 1945, P.L. 382, *as amended*, 53 P.S. §§ 301–374. The types of authorities created by local governments under its provisions are many, including School Authorities (issue bond to build schools and then lease them back to the school district); Water and Sewer Authorities, Airport Authorities and Recreation Authorities. Other statutes authorize local governments to create authorities for specific purposes, the most important being Housing Authorities Law, Act of May 28, 1937, P.L. 955, 35 P.S. §§ 1541–1571; Parking Authorities Law, Act of June 5, 1947, P.L. 458, *as amended*, 53 P.S. §§ 341–356; Industrial and Commercial Development Authority Law, Act of August 23, 1967, P.L.1967, *as amended*, 73 P.S. §§ 371–376; Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, 35 P.S. §§ 1701–1747.

· the need for an agency which can cross governmental boundary lines for the effective handling of intercommunity problems, e.g., SEPTA;

· the need for a method to carry out activities that are constitutionally or statutorily proscribed such as the need to finance public improvements without running afoul of the constitutional limits on debt.[7] (See Lesser v. Warren Borough, 237 Pa. 501, 85 A. 839 (1912) and more recently, to give or lend federal funds given to local governments for community development that otherwise would be constitutionally proscribed by Article 9, Section 9 of the Pennsylvania Constitution.[8]

While the first two reasons for the creation are very similar to reasons why a private corporation would create a subsidiary to carry out an enterprise or would enter into joint venture with another company,[9] the last reason, the need to avoid constitutional impediments, is the one that causes the confu-

---

**7.** Prior to the enactment of the amendment contained in Article 9, Section 9 to the Pennsylvania Constitution, Pennsylvania local governments had very low debt limits. Prior debt limits were based on real estate values within the jurisdiction and did not reflect increasing revenues from other taxes and sources. Article 9, Section 9 authorizes the General Assembly to set the debt unit. The Local Government Unit Debt Act, 53 P.S. §§ 6780–1—6780–609, now sets the limit based on the average total revenues of local government. Consequently, while the low constitutional debt limits were one of the reasons why the General Assembly authorized the creation of authorities, the higher debt limits makes this a less important factor.

**8.** Article 9, Section 9 of the Pennsylvania Constitution provides in relevant part:

The General Assembly shall not authorize any municipality or incorporated district to ... obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual.

**9.** While authorities were initially authorized for local government to create entities to carry out local or regional functions, authorities have been created by the Commonwealth for special purposes. See, e.g., Pennsylvania Higher Educational Facilities Authority, Act of December 6, 1967, P.L. 678, as amended, 24 P.S. §§ 5501–5517; Pennsylvania Industrial Development Authority Act, Act of May 17, 1956, P.L. 1609, 73 P.S. §§ 301–314; State Public School Building Authority Act, Act of July 5, 1947, 24 P.S. §§ 791.1–791.17. For the most part, board members of those authorities are composed of high state elected officials and the authorizing statutes do not contain the "instrumentality of the Commonwealth" language.

sion as to whether authorities are part of the Commonwealth and, if so, for what purposes. Because of the need to get around these constitutional impediments, the legislation authorizing the creation of authorities contains language that the authority is not an agency of the governmental unit(s) that creates it and appoints its board members, but is considered an agency of the Commonwealth. Typical of the language contained in most acts is the language contained in Section 1 of the Metropolitan Transportation Authorities Act, 74 P.S. 1502,[10] which states that:

> An authority shall in no way be deemed to be the instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.[11]

Even when the authorizing legislation is silent, because of the reason behind the creation of authorities to avoid restrictions on local governments, those authorities are still considered an instrumentality of the Commonwealth. *See Application of the Municipal Authority of The Township of Upper St. Clair*, 408 Pa. 464, 184 A.2d 695 (1962).[12]

While authorities may be considered an "instrumentality of the Commonwealth", that does not mean that they are automatically considered to be "the Commonwealth" for all purposes. To determine whether they should be considered as "the Commonwealth", we examine the intent of the General Assembly in enacting a particular piece of legislation. For example, our Supreme Court in *Marshall v. Port Authority of Allegheny County [PAT]*, 524 Pa. 1, 568 A.2d 931 (1990), looked to the definitions contained in that portion of the

10. The Act of August 5, 1991, P.L. 238, 74 Pa.C.S. §§ 1501–1543.

11. *See also* Housing Authorities Law, 35 P.S. § 1550; Parking Authorities Law, 53 P.S. § 345; Industrial and Commercial Development Authority Law, 73 P.S. § 376; Urban Redevelopment Law, 35 P.S. § 1709.

12. The authorizing legislation under which most authorities have been created, the Municipal Authorities Act, does not contain language that authorities created under its provisions are instrumentalities or agencies of the Commonwealth.

Judicial Code relating to sovereign immunity to determine whether a "Port Authority" created under the Second Class Port Authority Act [13] was a "commonwealth party." It stated:

Clearly, PAT may claim sovereign immunity if it is a "commonwealth party." A "commonwealth party" is defined in 42 Pa.C.S. § 8501 as "[a] Commonwealth agency and an employee thereof ..." Under 42 Pa.C.S. § 102, commonwealth agency is defined as "[a]n executive agency or independent agency." Agencies are classified as "executive" if they are under the supervision and control of the Governor, and, if they are not, as "independent." *Id.* Both of these types of agencies are expressly defined as including entities such as boards, commissions, authorities, and other agencies "of the Commonwealth government." *Id.* "Commonwealth government" is, in turn, defined as encompassing the following:

... the departments, boards, commissions, authorities and officers and <u>agencies of the commonwealth,</u> but the term does not include any political subdivision, municipal or other local authority, or any officer or agency of any such political subdivision or **local authority**. (Underline in original, bold text added.)

*Id.* at 4–5, 568 A.2d at 933.[14]

Because, like SEPTA, its authorizing legislation provides that "it exercises the powers of the Commonwealth as an

13. Act of April 6, 1956, P.L. (1955) 1414, *as amended,* 55 P.S. §§ 551–702.

14. Apparently not pointed out to our Supreme Court is that the term "local authority" is defined in the Statutory Construction Act. *See* 1 Pa.C.S. §§ 1501–1991. Under 1 Pa.C.S. § 1991, the section containing the general definitions applicable to all statutes provides:

The following words and phrases, when used in *any statute* finally enacted *on or after September 1, 1937,* unless the context clearly indicates otherwise, shall have the meanings given to them in this section:

"Local authority." When used in any statute finally enacted *on or after January 1, 1975,* a municipal authority or any other body corporate and politic *created by one or more political subdivisions pursuant to statute.* (Emphasis added.)

Because the Judicial Code was enacted after January 1, 1975, any authority that is created by a political subdivision would appear not to

agency thereof", our Supreme Court found that PAT was a "commonwealth party" and fell within the provisions of what is commonly known as the Sovereign Immunity Act rather than the provisions applicable to "local agencies." For the same reasons, the Supreme Court had previously held that SEPTA was protected by sovereign immunity. *See Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 517 A.2d 1270 (1986).

Just because it has been determined that SEPTA is considered a "commonwealth party" under the provisions of the Sovereign Immunity Act does not mean that it is the Commonwealth for all purposes. In each statute under consideration, courts have looked to the legislative intent to determine whether the General Assembly intended that type of authority to be considered "the Commonwealth." In *Fisher v. Southeastern Pennsylvania Transportation Authority*, 60 Pa.Commonwealth Ct. 269, 273, 431 A.2d 394, 397 (1981), we addressed the issue of whether the General Assembly intended SEPTA to be considered "the Commonwealth" as that term is used in Section 1 of the Act of July 12, 1935, P.L. 677, *as amended*, 65 P.S. § 114, which deals with payment of salaries of employees in the reserve component of the military. That section provides that all officers and employees of the Commonwealth are entitled to leave of absence from their duties without loss of pay when they are absent from work while in active service with the reserve units of the United States Armed Forces. Holding that SEPTA was not "the Commonwealth" and its employees were not entitled to back pay when absent from work while in the military service, we stated:

[W]e do not go so far as to suggest that whenever a legislative enactment refers to the 'Commonwealth', it means to embrace all authorities created by virtue of enabling acts. Furthermore, neither authorities nor municipalities are sovereign; they have no original or inherent or fundamental powers of sovereignty or of legislation; they have only the power and authority granted them by en-

be an "agency of the Commonwealth" under the provisions of the Judicial Code, including Chapter 85.

abling legislation.... The legislature many years ago recognized the need for efficient and inexpensive mass transportation systems designed to alleviate serious traffic difficulties in the overcrowded metropolitan areas of the Commonwealth. Thus, SEPTA and other transportation authorities were created pursuant to legislative guidelines designed to provide independent operating powers with minimal local government interference. The grant of broad powers by the Legislature was meant to insure efficient operation of the integrated transportation networks, not to expand the already large and complex state bureaucratic system. *We do not believe that the Legislature intended SEPTA to be a Commonwealth agency in the traditional sense or for SEPTA employees to be considered Commonwealth employees for purposes of other legislative enactments.* (Emphasis added.)

*Id.,* 60 Pa.Commonwealth Ct. at 273, 274, 431 A.2d at 396, 397.

■ Just as we determined what the legislative intent was as to authorities in those acts, whether contract claims brought against SEPTA must be brought before the Board of Claims is determined by whether authorities, such as SEPTA, created under the Metropolitan Transportation Authorities Act, fall within the term "Commonwealth" as used in the Board of Claims Act.[15]

Prior to the establishment of the Board of Claims, contract claims were heard by its predecessor, the Board of Arbitration of Claims, established by the Act of May 20, 1937, P.L. 728, 72 P.S. § 4651–1. That Board was created as a departmental administrative board in the Department of the Auditor General that was to arbitrate claims against the Commonwealth arising from contracts entered into by the Commonwealth. The Act was later amended by the Act of October 5, 1978, P.L. 1104, 72 P.S. § 4651–1, which created the present Board of

---

**15.** The Board of Claims was established by the General Assembly to hear contract claims brought against the state. This was done pursuant to Article I, Section 2 of the Pennsylvania Constitution which provides in pertinent part:

Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Claims. Similar to the Board of Arbitration of Claims, the Board of Claims was created as an independent administrative board to arbitrate contract claims involving the Commonwealth. Its powers were delineated at 72 P.S. § 4651–4 as follows:

> The Board of Claims shall have *exclusive jurisdiction* to hear and determine all claims against the *Commonwealth* arising from contracts hereafter entered into with the Commonwealth, where the amount in controversy amounts to $300.00 or more. (Emphasis added.)

Nowhere, however, in the Board of Claims Act is the term "Commonwealth" defined.

In addressing whether authorities are to be considered part of the Commonwealth as that term is used and defined in the Act, we have primarily examined whether the authority is financially independent of the Commonwealth and whether the entity was created to carry out statewide operations. They are not, absent express language in the statute, considered financially independent or statewide in operation. In *Delaware River Port Authority of Pennsylvania and New Jersey v. Board of Arbitration of Claims*, 45 Pa.Commonwealth Ct. 281, 405 A.2d 600 (1979) and *Pennsylvania Housing Finance Agency v. Abreen Corporation*, 84 Pa.Commonwealth Ct. 571, 480 A.2d 335 (1982), we utilized that test to determine whether those authorities were the "Commonwealth" for purposes of bringing a contract claim against them before the Board of Arbitration of Claims and its successor, the Board of Claims. In *Delaware River Port Authority of Pennsylvania and New Jersey*, an employment contract claim filed against the Port Authority was brought in our original jurisdiction. We determined that because the Port Authority was not financially dependent on the Commonwealth, it was not "the Commonwealth" and a claim under our original jurisdiction was inappropriate. We further determined that such a claim also could not be brought before the predecessor of the Board of Claims, the Board of Arbitration of Claims, for the same reason and jurisdiction was in the appropriate Court of Common Pleas.

Similarly, in *Pennsylvania Housing Finance Agency* (PHFA),[16] we determined that the PHFA was financially independent from the Commonwealth and not the "Commonwealth" for purposes of bringing a contract claim against it before the Board of Claims. We based that determination on the fact that the PHFA was empowered to issue bonds and notes payable out of its revenues, those bonds and notes did not constitute a debt of the Commonwealth, and that neither the faith and credit nor taxing power was pledged to the payment of the principal or interest on such bonds. Additionally, the PHFA was required to establish and maintain a capital reserve fund in an amount equal to the entire principal and interest due on its outstanding bonds and notes during the succeeding calendar year. Moreover, if it received an appropriation of funds from the legislature to avoid defaulting on payments to be made on notes and bonds, it was required to repay those funds to the Commonwealth as soon as possible in excess of the amount required to make and keep the agency self-supporting.

We believe SEPTA is no different than the Port Authority or the PHFA for purposes of deciding whether it is subject to the Board of Claims' jurisdiction. The Metropolitan Transportation Authorities Act makes it clear that authorities created under its provisions are financially independent of the Commonwealth. 74 Pa.C.S. § 1503(10), (12), (16), (21) and (30) provide that SEPTA has the following financial powers and duties:

(10) The authority shall fix such rates, fares and charges in such manner that they shall be at all times sufficient in the aggregate, and in conjunction with any grants from Federal or other sources and any other income available to the authority, to provide funds for the payment of all operating costs and expenses which shall be incurred by the authority, for the payment of the interest on and principal of all bonds, certificates and other obligations payable from said reve-

16. While denominated an "agency", it appears in this instance to be an authority by another name. *See* the Housing Finance Agency Law, 35 P.S. §§ 1680.101.—1700–11.

nues and to meet all other charges upon such revenues as provided by any trust agreement executed by the authority in connection with the issuance of bonds or certificates under this chapter.

(16) To pledge, hypothecate or otherwise encumber, all or any of the revenues or receipts of the authority as security for all or any of the obligations of the authority.

(21) The authority shall have no power, at any time or in any manner, to pledge the credit or taxing power of the Commonwealth, or any political subdivision, nor shall any of its obligations be deemed to be obligations of the Commonwealth or of any of its political subdivisions, nor shall the Commonwealth or any political subdivision thereof be liable for the payment of principal or interest on such obligations.

(30) The authority shall not have the power to levy taxes for any purpose whatsoever.

Moreover, authorities created under the Metropolitan Transportation Authorities Act must establish a damage reserve fund from gross receipts from their operations to provide for the defense and satisfaction of all claims or judgments against them. *See* 74 Pa.C.S. § 1538. 74 Pa.C.S. § 1511 also provides that "under no circumstances" shall any debt of the authority be considered an obligation of the commonwealth. As to the method of funding its operations, the Act does not require in any manner participation by the Commonwealth to fund its operations. 74 Pa.C.S. § 1531 provides that the counties and municipalities may enter into compacts to fund the operation of the authority. No mention is made that the Commonwealth should be part of these compacts. As such, because SEPTA's financial independence from the Commonwealth is at least as great as that of the PHFA and the Port Authority, it should be treated identically for purposes of contract claims.

As to whether SEPTA has statewide operations, we stated the following in *Fisher*:

In *Scott v. Shapiro,* 19 Pa.Commonwealth Ct. 479, 339 A.2d 597 (1975), we held that SEPTA's local activities and corre-

sponding lack of statewide authority prevented it from being a state agency for purposes of jurisdiction under the "Sunshine Law" [17] despite the statute which declares SEPTA an agency and instrumentality of the Commonwealth. There we stated:

> The legislature's grant of the powers of a State agency to SEPTA ... is necessitated only by the practical imperative of providing autonomy from local government interference with the operations of the agency.... While SEPTA is not 'local' in the traditional sense, in that it encompasses and affects a multi-county area, its activities are certainly not of statewide concern. *Id.* at 483–84, 339 A.2d at 599.

60 Pa.Commonwealth Ct. at 273–274, 431 A.2d at 397.

Such a conclusion is obvious, considering that one Metropolitan Transportation Authority is authorized to be formed in each Metropolitan area, thereby making SEPTA's operation not statewide on its face.

Because SEPTA is financially independent of the Commonwealth and its operations are not statewide, we conclude that the General Assembly did not intend SEPTA to be the Commonwealth for purposes of the Board of Claims Act. Accordingly, the decision of the Board of Claims is reversed.

## ORDER

AND NOW, this 14th day of January, 1994, that portion of the order of the Board of Claims dated November 17, 1992, No. 1621, denying Southeastern Pennsylvania Transportation Authority's Motion to Dismiss for Lack of Jurisdiction is reversed.

17. Act of July 19, 1974, P.L. 486, *as amended,* 65 P.S. §§ 261–269.