**PROGRAM ADMINISTRATION SERVICES, INC., f/k/a R.D. Fowler & Assoc., Inc., Appellant**

**v.**

**DAUPHIN COUNTY GENERAL AUTHORITY.**

Commonwealth Court of Pennsylvania.

Argued April 6, 2005.

Decided May 19, 2005.

Thomas W. Scott, Harrisburg, for appellant.

David E. Lehman, Harrisburg, for appellee.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge SMITH–RIBNER.

Program Administration Services, Inc. (PASI) appeals from an order of the Court of Common Pleas of Dauphin County that denied PASI's motion for summary judgment and entered a declaratory judgment in favor of the Dauphin County General Authority (Authority) in PASI's declaratory judgment action under the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531–7541. PASI sought a judicial determination as to whether two long-term bond administration contracts executed by PASI and the Authority in connection with the Authority's sale of two separate bond issues may be terminated other than according to the terms of the contracts.

The primary issue in this appeal is whether the trial court erred when it held that pooled school financing activities carried on by the Authority are governmental, thereby authorizing a newly appointed Authority Board of Directors to terminate existing contracts without cause and prior to their stated termination dates. An alternative issue is whether the Program Administration Agreements (Agreements) are the type of "agreements ... with others in connection with any bonds" issued by an authority that it is empowered to make for up to forty years pursuant to Section 5607(d)(12) of the Municipality Authorities Act (Act), 53 Pa.C.S. § 5607(d)(12), that bind an authority and cannot be avoided by later boards.

I

The Authority is a corporate agency of the Commonwealth created by Dauphin County under the former Municipality Authorities Act of 1945, Act of May 2, 1945, P.L. 382, *as amended, formerly* 53 P.S. §§ 301–322, repealed by Section 3 of the Act of June 19, 2001, P.L. 287, and continued in the current Municipality Authorities Act (Act), 53 Pa.C.S. §§ 5601–5623. The Authority's powers include authorization to issue bonds to help entities arrange financing for public projects. In 1986 the Authority launched a program to assist school

districts seeking to borrow money to finance new capital improvements or to refinance existing debt. This became known as "School Pool I" (Pool I); it was the model for a second such program established in 1997 known as "School Pool II" (Pool II).[1] Under the Agreements PASI has been responsible for marketing the programs to prospective school district borrowers, assisting in their applications, calculating note payments, billing the borrower school districts and assisting the Authority in securing investments of funds on deposit with the trustee banks.

Each Agreement includes provisions that it shall terminate (1) when no portion of the bonds remains outstanding and unpaid, (2) on continuing failure of the administrator to duly observe and perform in any material respect any covenant, condition or duty for a period of 30 days after written notice or (3) upon mutual agreement. In November 2000 PASI was notified that the Authority intended to terminate the Agreements without any cause for material breach. PASI initiated this declaratory judgment action seeking a judicial determination that the contracts may not be terminated in any manner outside the terms specified in the Agreements. The Authority filed preliminary objections in the nature of a demurrer, arguing in part that its activity was governmental rather than proprietary.

The trial court (Turgeon, J.) noted the high standard for sustaining a demurrer. It first ruled that the law did not state with certainty that the Authority should prevail in light of the recent decision in *Boyle v. Municipal Authority of Westmoreland County*, 796 A.2d 389 (Pa. Cmwlth.), *appeal denied*, 571 Pa. 709, 812 A.2d 1231 (2002), in which this Court stated that municipal authorities by their very definition engage in proprietary functions only. The trial court further ruled that the issue of whether the parties' relationship was that of employer and employee could not be decided without further development of the record.

■ Following discovery on remand, PASI moved for summary judgment. A three-judge panel of the trial court (Kleinfelter, P.J.) first rejected the contention that PASI is an employee rather than an independent contractor. On the issue of governmental versus proprietary activity, the court concluded that the contracts here logically involve a governmental function, relying primarily upon *State Street Bank & Trust Co. v. Commonwealth, Treasury*

1. The Authority entered into a Trust Indenture Agreement with a Trustee (Allfirst Bank for Pool I and Commerce Bank for Pool II). The Authority issued bonds and offered them for sale to the public ($200 million for Pool I and $250 million for Pool II). The bonds were purchased by private investors, and the money received created a "pool" of money that was available for the Authority to lend to qualifying school districts. When the bonds were issued the Authority and the Trustee entered into a "Program Administration Agreement" with a financial consulting firm, here PASI and its predecessor. The Authority lends money to school districts for dedicated purposes such as construction or reconstruction of school facilities. School districts pay all the costs associated with borrowing, including all fees of the administration agent, PASI. As school districts repay principal and interest on their loans, the interest is paid to bondholders and the principal is returned to the pool, from which it is available to be re-loaned.

Pool I was funded by forty-year bonds that mature in 2026. Pool II was funded by thirty-five-year bonds that mature in 2032. A three-way Program Administration Agreement among the Authority, the Trustee and PASI's predecessor (for Pool I) and PASI (for Pool II) was entered into for each program with the same term as the bonds. *See* Memorandum Opinion, Turgeon, J., filed May 31, 2002 (overruling preliminary objections filed by the Authority).

*Department,* 712 A.2d 811 (Pa.Cmwlth. 1998), and this Court's decision in *Lobolito, Inc. v. North Pocono School Dist.,* 722 A.2d 249 (Pa.Cmwlth.1998), *aff'd in part and rev'd in part,* 562 Pa. 380, 755 A.2d 1287 (2000). The court opined that the sweeping language used in *Boyle* that municipal authorities by their very definition engage in proprietary functions only was dictum, and, if taken literally, the *Boyle* holding was contrary to *Mitchell v. Chester Housing Authority,* 389 Pa. 314, 132 A.2d 873 (1957). The court declared that the Agreement's termination clause was unenforceable against the Authority and that it could terminate the Agreement as provided in its charter.[2]

## II

■ PASI first acknowledges the general rule that a government contract that exceeds the period of time when the officials making it are in office may be terminated by their successors, without cause, irrespective of the termination date or other procedures for termination set forth in the contract. *Lobolito,* 562 Pa. 380, 755 A.2d 1287 (2000). Nevertheless, two basic exceptions to this general rule are that it applies only to contracts involving the performance of a governmental function and that it does not apply to classes of contracts specifically exempted by the legislature to permit governments to make and acquire long-term commitments when necessary for the public good. To protect the sanctity of the vote, incoming officials must be free to make and to enforce policies and contracts affecting governmental functions. The opposite reasoning applies in regard to proprietary functions, where a govern-

mental party provides goods and services otherwise available through the private market. Then the government entity is in competition with or acting in place of private market providers, and public policy favors holding all suppliers to the same standards of contractual responsibility.

PASI contends that the trial court's holding that the School Pool programs represent governmental functions is contrary to *Boyle,* where the Court also had to decide whether a municipal authority could terminate a long-term contract with an independent contractor before it expired. The decision in *Boyle* relied upon the analysis of municipal authorities in *Southeastern Pennsylvania Transportation Authority v. Union Switch & Signal, Inc.,* 161 Pa.Cmwlth. 400, 637 A.2d 662 (1994), which stated that unlike municipal corporations, which have "governmental" and "proprietary" functions, authorities engage only in the latter: they are public corporations that generally are established for the purpose of financing and managing revenue producing projects of a public nature or other activities not considered to be part of core governmental activities, i.e., governmental business ventures.

In *Mitchell* the Pennsylvania Supreme Court held that a municipal housing authority organized pursuant to the Housing Authorities Law, Act of May 28, 1937, P.L. 955, *as amended,* 35 P.S. §§ 1541–1565, was performing a governmental function insofar as it exercised police powers of the Commonwealth in connection with a large part of its operation. The court held as well that a five-year employment contract given to the secretary/executive director by an outgoing board majority was intend-

---

2. The Court's review in a declaratory judgment action is limited to determining whether the trial court committed an error of law, abused its discretion or made necessary findings of fact not supported by substantial evi-

dence in the record as a whole. *In re Funds in Possession of Conemaugh Township,* 724 A.2d 990 (Pa.Cmwlth.1999), *aff'd,* 562 Pa. 85, 753 A.2d 788 (2000).

ed to bind successor boards; that it was the crucial administrative position that embodied the authority's governmental function and required an intimate relationship with the board; and that successor boards should not be hamstrung by the imposition of a policy-implementing and to some extent policymaking machinery not attuned to the new body's policies. Thus the contract was unenforceable. PASI notes that *Mitchell* was an employment contract case.

Additionally, PASI contends that even if the Authority is capable of engaging in governmental functions, the school financing arrangements at issue are proprietary. A governmental function is one performed for public purposes exclusively in its public, political or municipal character. *Boyle* (citing *Falls Township v. Scally*, 115 Pa.Cmwlth. 56, 539 A.2d 912 (1988)). A proprietary function is one that traditionally or principally has been performed by private enterprise. *State Street Bank & Trust Co.* In determining whether activity is governmental or proprietary the Court will consider whether it: (1) is one that government is not statutorily required to perform; (2) also may be carried on by private enterprise; and (3) is used as a means of raising revenue. *Boyle* (citing *County of Butler v. Local 585, Service Employees Int'l Union, AFL–CIO*, 158 Pa. Cmwlth. 519, 631 A.2d 1389 (1993)).[3] PASI asserts that the Authority's school financing activities meet all three prongs of the *Boyle* test—the Authority is not statutorily required to sell bonds, raise funds or loan those funds to school districts. Also most municipal borrowing is supplied by the private market, and the activity obviously raises money.

PASI maintains that the trial court misapplied the Supreme Court's holding in *Lobolito*, where the issue was whether a new school board could avoid an earlier contract to construct a new school, and the court held that the decision whether to build a school clearly was a governmental function. Here, however, the Authority does not make such decisions; it simply lends money to school districts that do decide to build, refurbish or refinance. Similarly, *State Street Bank & Trust Co.* actually supports PASI's position. The outgoing Treasurer's entering into a long-term contract with a particular bank to act as the exclusive agent for securities lending services with regard to state assets held under a custody agreement was a governmental action. The Treasurer was constitutionally and statutorily required to keep secure and to prudently manage assets of the State, but the Court noted that custodial and securities lending activities are functions frequently and principally performed by private enterprise.

Finally, PASI offers express statutory authorization for the contracts. Section 5607(d)(12) of the Act empowers any authority chartered under the Act to issue

**3.** A similar analysis is employed in New York. In *Karedes v. Colella*, 100 N.Y.2d 45, 760 N.Y.S.2d 84, 790 N.E.2d 257 (2003), the court discussed the "term limits rule," which prohibits one municipal body from contractually binding its successors in areas relating to governance unless specifically authorized by statute or charter provision to do so. Elected officials must be free to exercise legislative and governmental powers within their own discretion, but they ordinarily may not do so in a manner that limits the discretion of their successors. Classification of an activity as governmental depends on considerations including whether the activity was historically performed by government, whether it is best executed by government and whether it is undertaken for profit or revenue. In business or proprietary matters, by contrast, a municipality is not necessarily bound by this standard, and it may conduct itself as any other private business under similar circumstances. Proprietary functions are those in which governmental activities essentially substitute for or supplement traditionally private enterprises.

bonds with a maturity up to forty years and "to make agreements with the purchasers or holders of the bonds *or with others* in connection with any bonds, whether issued or to be issued, as the authority shall deem advisable; and in general to provide for the security for the bonds and the rights of the bondholders." (Emphasis added.) Section 5607(d)(6), 53 Pa.C.S. § 5607(d)(6), empowers authorities "[t]o finance projects by making loans, which may be evidenced by and secured as may be provided in loan agreements, mortgages, security agreements *or any other contracts,* instruments or agreements, which contracts, instruments or agreements may contain such provisions as the authority shall deem necessary or desirable for the security or protection of the authority or its bondholders." (Emphasis added.) Under Section 5617, 53 Pa.C.S. § 5617, the authority shall not perform any act to impair the security of holders of the obligations of the authority or "*violate any agreements with them or for their benefit.*" (Emphasis added.)

The Authority asserts that it provides "conduit financing," which is distinct from ordinary borrowing. Funds were raised by the sale of bonds secured by the Trust Indenture, and bondholders have no recourse against the Authority. The Trust Indenture defines the Program Administrator as PASI or its successor or any other person appointed by the Authority from time to time. In its argument the Authority posits that the background to this dispute is that Robert D. Fowler, the chief executive of PASI, had been the Authority's financial advisor advising the Authority on matters leading to its decisions. After several real estate investment projects that Fowler advocated proved to be detrimental rather than beneficial, assertedly because of ill-considered financial assumptions, the Authority lost confidence in Fowler.

In addition, the Authority contends that its contracts involve a governmental function; and it disputes PASI's characterization of the Authority as akin to a private bank. The ultimate borrowers are the school districts and the ultimate lenders are the bondholders, and the Authority does not earn a profit—interest paid by borrowers is remitted to the indenture holder. In *Lobolito* the Supreme Court identified the construction of a new school as the "crux" of a joint development agreement between a school district and a private developer who proposed to construct a sewage treatment facility to service the new school when constructed. The Authority contends that the "crux" of the School Pool program is to enable construction of school capital projects across the state. Regarding *State Street Bank & Trust Co.,* the Authority proffers that funds held in the School Pools for school construction are no less public than funds held by the Treasurer. As well, the Authority acts as the school districts' alter ego by providing financing.[4]

As for *Boyle,* the Authority contends that the sweeping language characterized by the trial court as dictum was overbroad and is contradicted by statute. The Authority quotes repealed Section 15 of the

---

4. The Authority notes that authorities may be organized for a wide variety of purposes under Section 5607(a)(1)-(17) of the Act, 53 Pa. C.S. § 5607(a)(1)-(17). There is a general ban on competition with private enterprise, Section 5607(b)(2), 53 Pa.C.S. § 5607(b)(2), but the ban does not extend to enumerated purposes under Section 5607(b)(2)(iv). The Section 5607(b)(2)(iv) exception applies in pertinent part to "school building projects and facilities to be leased to or financed with loans to private, nonprofit, nonsectarian secondary schools, colleges and universities, State-related universities and community colleges...."

Municipality Authorities Act of 1945, former 53 P.S. § 318, but virtually identical language is in the current Act, 53 Pa.C.S. § 5620:

> The effectuation of the authorized purposes of authorities created under this chapter shall be for the benefit of the people of this Commonwealth, for the increase of their commerce and prosperity and for the improvement of their health and living conditions. Since authorities will be performing essential governmental functions in effectuating these purposes, authorities shall not be required to pay taxes or assessments upon property acquired or used by them for such purposes.

The Authority recites the rationale expressed in *Mitchell* for allowing a newly appointed governmental body to function unhampered by the policies of its predecessors, and it disputes PASI's reliance on Section 5607(d)(12) of the Act, noting that the bond issues and the program administration agreements are two different things and that the language permitting authorities to make agreements with others in connection with any bonds does not require that the agreements be coextensive. Nothing in the Trust Indenture confers any rights upon PASI.

### III

In *Lobolito* the Supreme Court observed that since the mid-nineteenth century it had distinguished between agreements encompassing governmental functions of governing bodies and agreements encompassing proprietary or business functions, citing *Western Saving–Fund Society of Philadelphia v. City of Philadelphia*, 31 Pa. 175, 183 (1858) (distinguishing governmental contracts, or contracts encompassing "things public," from proprietary contracts, or contracts encompassing "things of commerce").

The court noted that most contemporary illustrations of the governmental-proprietary distinction had come from this Court. In *State Street Bank & Trust Co.* this Court held that the multi-year contract custody and securities lending agreement between the treasurer and a bank encompassed a governmental function of safekeeping the Commonwealth's assets. In *Falls Township v. McManamon*, 113 Pa.Cmwlth. 504, 537 A.2d 946 (1988), the Court determined that an employment contract between township supervisors and a police chief encompassed the governmental function of ensuring public safety. In *County of Butler*, however, the Court determined that a contract between county commissioners and a private contractor to operate a freestanding drug and alcohol rehabilitation treatment facility encompassed a proprietary function and could be enforced against successor commissioners.

■ In the present case, the Court concludes that the Authority's activity of lending money to school districts for financing school construction is proprietary in nature. Under the *County of Butler* test, this is an activity that the Authority is not required by statute to perform, and it is one that certainly is carried on by many private lenders. The mere fact that the Authority lends money to a school district for school construction does not make the act of lending governmental in character any more than it would be if the loan were made by a private bank. The decision whether to build a school building is a governmental function. *Lobolito.* Here, however, the Authority does not purport to decide whether any school district should build a school; it serves only as a means of financing such projects if one does. To accept the Authority's position would eviscerate the long-recognized distinction be-

tween governmental and proprietary activity.

The Authority's argument that it provides conduit financing, with the bondholders being the ultimate lenders, helps to distinguish this case from *State Street Bank & Trust Co.* The funds here are not assets of the State but rather assets of the bondholders, analogous to assets of depositors. Although the School Pool programs unquestionably facilitate school construction projects and so serve a valuable public purpose, it is incontrovertible that financing of school construction does take place through private channels and would do so if the School Pool programs ceased to exist. Moreover, the Authority's "alter ego" analysis does not fit this situation because the Authority does not hold title to property on which school districts construct new schools.[5]

■ The Court agrees with the trial court on one point. Judicial dictum is not binding authority. *In re Cassell's Estate,* 334 Pa. 381, 6 A.2d 60 (1939). Dictum has been defined as " '[a]n opinion by a court on a question that is directly involved, briefed, and argued by counsel, and even passed on by the court, but that is not essential to the decision.' " *City of Lower Burrell v. City of Lower Burrell Wage & Policy Committee,* 795 A.2d 432, 437 n7 (Pa.Cmwlth.2002) (quoting Black's Law Dictionary 465 (7th ed.1999)). In *Boyle,* where an agreement concerning a water and wastewater management system was at issue, the Court set forth the law concerning the governmental-proprietary distinction and analysis, including the *County of Butler* three-pronged test. The Court indicated that the Superior Court specifically held that a municipality or municipal authority operating a water system acts in a proprietary rather than a governmental capacity, citing *Yezioro v. North Fayette County Municipal Authority,* 193 Pa.Super. 271, 164 A.2d 129 (1960). In view of that analysis, the statement in *Boyle* that authorities by their very definition engage in proprietary activities only was unnecessary to the decision reached. That statement, consequently, must be classified as dictum although the remainder of the opinion retains vitality and precedential force.

Finally, with regard to PASI's alternative argument, the Court agrees with PASI that the Agreements fit within the meaning of Section 5607(d)(12) of the Act, which authorizes authorities to issue bonds with a maturity date up to forty years from the date of issue and also "to make agreements with the purchasers or holders of the bonds *or with others in connection with any bonds,* whether issued or to be issued, as the authority shall deem advisable...." As PASI argues, various statutory exceptions exist to the general rule that current governing bodies may not bind successors, for example by providing for teacher tenure to assure that competent professional educators will not be dismissed without cause. *See Lauer v. Millville Area School Dist.,* 657 A.2d 119 (Pa. Cmwlth.1995). No one asserts that a program administration agreement such as that involved here must be coextensive with the maturity period of the bonds. As the former amendments to the School Pool I agreement show, *see* n6 below, such agreements need not extend for the entire maturity period. Under Section

---

5. *See Southwest Delaware County Municipal Authority v. Aston Township,* 413 Pa. 526, 198 A.2d 867 (1964) (holding that a school authority, holder of title to property leased to school district on which it operates a school, acts as "alter ego" of the district to undertake public school construction projects that the district, by reason of debt limitations, may not undertake).

5607(d)(12), however, they may.[6] Therefore, under this alternative analysis as well, the Agreements at issue here are fully enforceable. Accordingly, the order of the trial court is reversed.

### ORDER

AND NOW, this 19th day of May, 2005, the order of the Court of Common Pleas of Dauphin County denying Appellant's motion for summary judgment is reversed in accordance with the foregoing opinion.

## DISSENTING OPINION BY Judge PELLEGRINI.

I join with Judge Cohn Jubelirer's excellent dissent but write separately to note that this court, by allowing a 40 year contract to be entered into by a public body, essentially allows public authorities to be captured by and serve private interests

rather than be controlled by and serve public interests. As we recently stated in *County of Venango v. Housing Authority of County of Venango*, 868 A.2d 646 (2005):

> Authorities are public bodies entrusted with public funds and they carry out public responsibilities. While the General Assembly wanted authorities insulated from day-to-day politics, by making the "appointing power" elected officials, it recognized a principle at the core of a representative democracy—elections should make a difference and the public bodies should be answerable to the electorate. If the electorate is dissatisfied with how an authority's board is carrying out its public responsibilities, then it can vote out of office the elected officials that appointed the members of the board. (Footnote omitted.)

In regard to additional arguments raised by the Authority, former amendments to Pool 1 Agreement provided other termination terms such as upon ninety days' or one year's written notice. The final amendment was headed "Third Amendment" but was referred to by the trial court as the "Second Third Amendment" because it did not refer to a previous Third Amendment. The final amendment eliminated subsection (e) of Section 7.01 of the Agreement altogether, which was where previous amendments relating to termination were included. Therefore, no former amendment stating different terms of termination remained in effect. Further, the Court rejects the Authority's brief assertion that the amendment benefited only PASI, granting it a long-term lock on its position, and the implication that it was not supported by consideration. As the record shows, the Pool I Agreement was modified several times, and as PASI notes, the Authority's solicitor issued opinions in connection with remarketings stating that the indenture, remarketing agreement, program administration agreement and rate contract had been duly and validly authorized, executed and delivered by the Authority. R.R. 45a, 46a.

**6.** Separately, the Authority argues that the trial court's order may be affirmed on the basis that PASI was a servant of the Authority rather than an independent contractor. It cites *Feller v. New Amsterdam Casualty Co.*, 363 Pa. 483, 70 A.2d 299 (1950), where the Supreme Court stated that it is not the actual interference or exercise of control by the employer but the existence of the right or authority to interfere or control that renders one a servant rather than an independent contractor. The Court concludes that the trial court's ruling on the issue of employee/independent contractor was correct. Under the terms of the Agreements and the actual practice that followed, the administrator was given wide latitude in administering the program with the Authority retaining control only in matters of policy. *See* Pool I Agreement, Sections 2.01(g) and 4.02. R.R. 16a, 17a. Further, PASI was engaged in a distinct occupation and was retained because of its specialized skills; payment for services came in the form of a fee that was essentially a commission, and the final form of the Agreements did not provide the Authority the right to terminate PASI at any time. *See Shafer v. State Employees' Retirement Board*, 548 Pa. 320, 696 A.2d 1186 (1997); *Boyle.*

Now, through the device of a long term contract, whether it be 40 or 100 years, a "captured" authority cannot be recaptured and the wishes of the electorate can be ignored.

Judge COHN JUBELIRER joins this dissent.

## DISSENTING OPINION BY Judge COHN JUBELIRER.

Respectfully, I dissent because I believe that: 1) *Boyle v. Mun. Auth. of Westmoreland County*, 796 A.2d 389 (Pa.Cmwlth. 2002), *petition for allowance of appeal denied*, 571 Pa. 709, 812 A.2d 1231 (2002), must be overruled; 2) the Authority is acting in a governmental, not proprietary capacity; and 3) the contract at issue here is not subject to a statutory exception.

First, I agree with the majority to the extent it discredits the broad statement in *Boyle* that municipal authorities engage in proprietary functions only. However, I disagree with the majority that the statement is *dicta*. Rather, because that statement formed the *only* expressed rationale for the Court's holding, *Boyle* should be overruled.

As authority for its broad statement, *Boyle* cites *Southeastern Pennsylvania Transp. Auth. v. Union Switch & Signal, Inc.*, 161 Pa.Cmwlth. 400, 637 A.2d 662, 664–65 (1994), *petition for allowance of appeal denied*, 538 Pa. 662, 648 A.2d 792 (1994). In *Union Switch*, the only issue before the Court was whether SEPTA is considered to be the "Commonwealth" for purposes of determining jurisdiction when contract claims are filed against it with the Board of Claims. In that context, we engaged in a general discussion about the difficulty of determining the status of an authority. Within that context we stated in *dicta:*

> Unlike municipal corporations that have "governmental" and "proprietary" functions, authorities engage only in the latter. Authorities are "public corporations, being corporate agencies engaged in the administration of civil government." *Lighton v. Abington Township*, 336 Pa. 345, 353, 9 A.2d 609, 613 (1939). Generally, authorities are established for the purpose of financing and managing various revenue producing projects of a public nature or other activities that are not considered to be part of core governmental activities; they are a governmental business venture, a form of quasi-privatization.

*Id.* (footnote omitted.) The issue in *Union Switch* did not involve whether SEPTA was acting in a governmental or proprietary capacity, and the opinion did not address that issue. However, in *Boyle*, unlike in *Union Switch*, the issue **was** whether or not the authority was functioning in a proprietary or governmental capacity when it operated and managed a water supply and wastewater system as a municipal water authority. The Court, thus, based its holding in *Boyle* on the *dicta* in *Union Switch*. I agree with the majority that, under our case law, operation of a sewer system is considered proprietary. Thus, I believe that our opinion in *Boyle* reached the correct result. Our rationale, however, constituted an inaccurate extension of the law. While I applaud the majority for discrediting that rationale, because, in my opinion, the effect of doing so is to *sub silentio* overrule *Boyle*, I believe that we should overrule the case explicitly to provide clear guid-

ance to the bar and to prevent inadvertent reliance upon it in future decisions.[1,2]

Second, I disagree with the majority that the Authority is acting in a proprietary capacity. As the majority correctly notes, a governmental function is one performed for public purposes exclusively in its public, political or municipal character. *Falls Tp. v. Scally,* 115 Pa.Cmwlth. 56, 539 A.2d 912, 914 (1988). A proprietary function is one that traditionally or principally has been performed by private enterprise. *State St. Bank & Trust Co. v. Treasury Dep't,* 712 A.2d 811, 814 (Pa.Cmwlth.1998). The distinction between governmental and proprietary functions is an important one because ".[w]ith respect to those agreements involving municipal or legislative bodies that encompass governmental functions ... governing bodies cannot bind their successors." *Lobolito, Inc. v. N. Pocono School Dist.* 562 Pa. 380, 384–85, 755 A.2d 1287, 1289 (2000)(*Lobilito II*). In *Mitchell v. Chester Housing Auth.,* 389 Pa. 314, 324–25, 132 A.2d 873, 878 (1957), the Supreme Court explained the public policy behind this rule of law:

> The obvious purpose of the rule is to permit a newly appointed governmental body to function freely on behalf of the public and in response to the governmental power or body politic by which it was appointed or elected, unhampered by the policies of the predecessors who have since been replaced by the appointing or electing power. To permit the outgoing body to 'hamstring' its successors by imposing upon them a policy-

1. I also agree with the Authority's contention that the per se rule in *Boyle,* that municipal authorities engage only in proprietary functions, is contrary to precedent of the Pennsylvania Supreme Court and to statutory authority that states that authorities do perform governmental functions. In *Mitchell v. Chester Housing Auth.,* 389 Pa. 314, 132 A.2d 873 (1957), the Pennsylvania Supreme Court held that a municipal housing authority organized pursuant to the Housing Authorities Law, Act of May 28, 1937, P.L. 955, *as amended,* 35 P.S. §§ 1541–1565, was performing a governmental function insofar as it exercised police powers of the Commonwealth in connection with a large part of its operation. There, the Supreme Court held that a five-year employment contract given to the secretary/executive director by an outgoing board majority was intended to bind successor boards; that it was the crucial administrative position that embodied the authority's governmental function and required an intimate relationship with the board; and, that successor boards should not be hamstrung by the imposition of a policy-implementing and, to some extent, policymaking machinery not attuned to the new body's policies. Thus, it concluded that the employment contract was not enforceable. The per se rule in *Boyle* is, thus, contrary to the holding in *Mitchell.*

In addition to its inconsistency with *Mitchell,* the language in *Boyle* is also contradicted by statutory authority. Section 15 of the Municipality Authorities Act of 1945, Act of May 2, 1945, P.L. 382, *as amended, formerly* 53 P.S. § 318, which, although repealed by the Act of June 19, 2001, P.L. 287, was in effect when the Authority was created, and which is virtually identical to Section 5620 of the current Municipal Authorities Act (Act), 53 Pa. C.S. § 5620, stated:

> The effectuation of the authorized purposes of authorities created under this chapter shall be for the benefit of the people of this Commonwealth, for the increase of their commerce and prosperity and for the improvement of their health and living conditions. *Since authorities will be performing essential government functions* in effectuating these purposes, authorities shall not be required to pay taxes or assessments upon property acquired or used by them for such purposes. . . .

(Emphasis added.) Because I conclude that the per se rule in *Boyle* is not consistent with Supreme Court precedent and statutory authority, I would overrule it for this reason as well.

2. I also note that municipal authorities have been given certain privileges *because of* their governmental functions. Importantly, municipal authorities are "local agencies" for purposes of asserting governmental immunity under Section 8542 of the Judicial Code, 42 Pa.C.S. § 8541. *Rhoads v. Lancaster Parking Auth.,* 103 Pa.Cmwlth. 303, 520 A.2d 122 (1987), *petition for allowance of appeal denied,* 515 Pa. 611, 529 A.2d 1084 (1987). It would be contradictory for governmental immunity to be granted to a municipal authority if it could *only* act in a proprietary capacity.

implementing [sic] and to some extent, policymaking machinery, which is not attuned to the new body or its policies, would be to most effectively circumvent the rule.

In determining whether an activity is governmental or proprietary, the Court must consider (1) whether the activity is one that government is not statutorily required to perform; (2) whether the activity also may be carried on by private enterprise; and (3) whether the activity is used as a means of raising revenue. *County of Butler v. Local 585, Serv. Employees Int'l. Union, AFL–CIO*, 158 Pa.Cmwlth. 519, 631 A.2d 1389, 1392–93 (1993). If the answer to any of these questions is "yes," the activity is proprietary.

The Authority provides what it describes as "conduit financing," which is distinct from ordinary borrowing. It explains that the School Pool's funds were raised by the sale of bonds secured by the Trust Indenture,[3] and bondholders have no recourse against the Authority. Further, unlike a private bank, the ultimate borrowers are the school districts, the ultimate lenders are the bondholders, and the Authority does not earn a profit. Rather, interest paid by borrowers is remitted to the indenture holder.

In *Lobolito, Inc. v. N. Pocono School Dist.*, 722 A.2d 249 (Pa.Cmwlth.1998)(*Lobilito I*), *affirmed in part and reversed in part, Lobilito II*, the owner and developer of a tract of land, Lobilito, Inc., entered into a contract with the old school board to construct and operate a sewage treatment plant for a planned new elementary school. Soon thereafter, a majority of the old school board was voted out of office. When the new board took office, it voted

not to build the elementary school or utilize the proposed sewage plant. Lobilito, Inc. sued for breach of the agreement and the new board defended on the theory that it was acting in its governmental capacity and, therefore, could cancel the agreement. The trial court agreed, as did this Court, when we stated that the contractual provisions, in so far as they pertained to sewage facilities, were ancillary to the use of the new building. *Lobolito I*. *Lobolito I* was affirmed in part and reversed and remanded in part by *Lobolito II*, in which the Supreme Court reasoned that:

> Given that the authority to build schools rests with local boards and that decisions concerning the creation and operation of schools is a basic governmental function, we find that the successor school board was not obligated to honor the agreement entered into by the predecessor school board and Lobilito. To require such a contract to be enforced would be to inappropriately compel the successor board to either follow the governmental policies of its predecessor or be faced with substantial liability, including the possibility of consequential damages, for merely seeking to implement its own policies.

*Lobolito II*, 562 Pa. at 388–89, 755 A.2d at 1291 (footnote omitted). In reaching this conclusion, the Supreme Court noted that the "driving force behind the [contract]" or the "crux" of the agreement was the construction of a new school and that the services aspect of the agreement would be "devoid of meaning without the school board's predicate promise to build the school." *Id.* at 387, 755 A.2d at 1291. Similarly here, the "crux" of both the School Pool and the PASI Agreements is

---

**3.** The Trust Indenture defines the "Program Administrator" as PASI or its successor or any other person appointed by the Authority from time to time.

premised on the implementation of new capital improvements for the public school system. Indeed, without such capital improvement projects, there would be no need for the financing duties performed via the Agreements. Therefore, those Agreements are ancillary to the capital improvement projects and, consequently, entail governmental, not proprietary functions.

Third, I disagree with the majority's view that the contracts here are specifically excepted by the legislature on the basis that they permit the Authority to make and acquire long-term commitments when necessary for the public good. Section 5607(d)(12) of the Act, 53 Pa.C.S. § 5607(d)(12), upon which the majority relies, empowers any authority chartered under the Act to issue bonds with a maturity up to forty years and "to make agreements with the purchasers or holders of the bonds *or with others* in connection with any bonds, whether issued or to be issued, as the authority shall deem advisable; and in general to provide for the security for the bonds and the rights of the bondholders." (Emphasis added.) I disagree that this provision compels a decision in PASI's favor because nothing in this statutory provision provides that a *program administration agreement,* such as that involved here, *must* be coextensive with the maturity period of the bonds. The fact that it *may,* as the majority observes, does not, in my view, render it a specific statutory exemption.

For all of these reasons, I would affirm the order of the trial court.

Judge PELLEGRINI joins in this dissenting opinion.