DISSENTING OPINION BY
President Judge PELLEGRINI.
The question in this case is whether the Southeastern Pennsylvania Transportation Authority (SEPTA) is subject to the City of Philadelphia’s (Philadelphia) anti-discrimination ordinances enacted pursuant to a grant of power in the First Class City Home Rule Act[1] and the Pennsylvania Human Relations Act (PHRA).[2]
In finding that SEPTA is not subject to those ordinances, as instructed on remand, the majority conducts an analysis as set forth in Department of General Services v. Ogontz Area Neighbors Association, 505 Pa. 614, 483 A.2d 448 (1984), to determine which entity prevails “[w]hen there is an apparent conflict in the use of ... powers” by two different governmental entities or agencies. Ogontz, 483 A.2d at 453-54 *1176 (quoting City of Pittsburgh v. Commonwealth, 468 Pa. 174, 360 A.2d 607, 612 (1976)). Noting that both government agencies were creatures of statute, our Supreme Court adopted a two-part test for resolving this statutory construction problem. First, it must be determined whether one legislative scheme was intended to have priority over the other. Second, if that priority cannot be discerned, courts must try to glean legislative intent in a way that “would give effect to the legislative mandates of both governmental entities.” Id. at 455.
Employing a common set of tropes, the majority finds under the first prong of Ogontz that SEPTA has legislative priority because it is “an instrument of the Commonwealth” that leads the majority to what it considers a certain narrative inevitability that SEPTA’s interests in running a “transportation system” are paramount over Philadelphia’s interest in enacting and enforcing human relations ordinances specifically authorized by the General Assembly to root out invidious discrimination.
As to the second prong, the majority succumbs and blindly accepts SEPTA’s baseless claims, without any evidence, that if subject to local human relations ordinances, SEPTA somehow could not carry out its transportation' responsibilities because it would be required to know what each local human relations ordinance provides in the 100 different municipalities in which it operates, again, “without proof’ that each of those municipalities has a human relations ordinance.
I respectfully dissent because, under the first prong of Ogontz, SEPTA is subject to charges of discrimination brought under Philadelphia’s anti-discrimination ordinances because it is clear under the Constitution and the legislative scheme that Philadelphia’s interests in eliminating discrimination are paramount under the
grants of power given to it as compared to the powers given to SEPTA by the General Assembly. If we even need to get to the second prong, both mandates of both agencies would not be impeded if SEPTA is made subject to Philadelphia’s anti-discrimination ordinances because Philadelphia would be able to carry out its legislative mandate without in any way impeding SEPTA’s ability to provide public transportation.
Moreover, the consequences subjecting SEPTA to Philadelphia’s antidiscrimi-nation ordinances as well as any other relevant local laws is no more than an inconvenience that any multi-jurisdictional private business is subject to in order to operate. However, the consequence of failing to apply those anti-discrimination ordinances is that Philadelphia residents would not be protected by the antidiscrimi-nation ordinances which, in addition to the local enforcement of the traditional subjects of discrimination, also forbid discrimination on the[1] basis of a person’s sexual orientation and gender identity which are classes not protected by the state PHRA. The majority acknowledges this “is at the heart of the current controversy” because it was not until after those types of claims of anti-discrimination were raised that SEPTA claimed that it was not subject to Philadelphia’s anti-discrimination ordinances.
I.
Under the first prong of the Ogontz test, we must examine the legislative scheme to determine which governmental entity has priority. In this case, this prong is particularly important because this is the first case involving an authority, SEPTA, an entity that is not directly controlled by elected officials.
*1177 A.
SEPTA, headquartered in Philadelphia, was created in 1963 pursuant to the Metropolitan Transportation Authorities Act, 74 Pa.C.S. §§ 1701-1785, to provide public transportation in the area commonly known, as the SEPTA name suggests, the five counties commonly identified as Southeastern Pennsylvania — Philadelphia, Bucks, Chester, Delaware and Montgomery counties. 74 Pa.C.S. § 1713. When operating outside those counties, SEPTA is treated just like any private common carrier and must obtain a certificate of public convenience from the appropriate regulatory agency. 74 Pa.C.S. § 1711.
SEPTA is governed by a 15-member Board. ■ Uniquely, while Philadelphia appoints only two members to the Board, those two members can veto any item that is approved by the full SEPTA Board unless that veto is overridden with the vote of at least 75% of the full Board within 30 days. The other four counties appoint two members each. Of the remaining five members on the Board, the Governor and majority and minority leaders of the two houses of the Pennsylvania State Legislature appoint one member each.
Though the Commonwealth does not have power to appoint a majority of its Board members, Section 1711(a) further states that “[a]n authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.” 74 Pa.C.S. § 1711(a) (emphasis added).
Notwithstanding that language, SEPTA is not considered to be the same as the Commonwealth. In Southeastern Penn-sylvania Transportation Authority v. Union Switch & Signal, Inc., 161 Pa.Cmwlth. 400, 637 A.2d 662, 665, appeal denied, 538 Pa. 662, 648 A.2d 792 (1994), we stated the difficulty in determining the status of SEPTA or, for that matter, any authority, is directly related to the reasons behind its creation and authorization by the General Assembly. We explained:
Although authorities owe their existence tu the various units of government and their governing boards are appointed by those entities, they are not considered part of the normal governmental structure. Unlike municipal corporations that have “governmental” and “proprietary” functions, authorities engage only in the latter. Authorities are “public corporations, being corporate agencies engaged in the administration of civil government.” Generally, authorities are established for the purpose of financing and managing various revenue producing projects of a public nature or other activities that are not considered to be part of core governmental activities; they are a governmental business venture, a form of quasi-privatization. (Citations and footnotes omitted)

Id.

SEPTA was created to take over the business of providing transportation that was formerly provided by private transportation companies such as the Philadelphia" Transportation Company, Philadelphia Suburban Transportation, Schuylkill Valley Lines and/or the Penn Central and Conrail. See Application of Philadelphia Suburban Transportation Co., 216 Pa.Super. 803, 264 A.2d 180 (1970); Southeastern Pennsylvania Transportation Authority v. Philadelphia Transportation Co., 38 Pa. D. & C.2d 653, 654-55 (Pa.Com.Pl. 1965). In short, SEPTA is in the transportation business, not in the business of governing.
B.
While it is often said that “municipalities are creatures of the General Assembly,” *1178 that formulation has not be accurate since our Constitution was amended in 1968 to provide that “[t]he General Assembly shall provide by general law for local government within the Commonwealth.” Pa. Const, art. IX, § 1. The Pennsylvania Constitution also provides that “[mjunicipalities shall have the right and power to frame and adopt home rule charters,” and that pursuant to such charters, a home rule municipality “may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.” Pa. Const, art. IX, § 2. Precisely speaking, municipalities are not creatures of the General Assembly, but creatures of the Constitution created to mandate that local matters be addressed by local citizens and the officials that they elect.
Philadelphia is a home rule municipality authorized by the General Assembly by the First Class City Home Rule Act.[3] Section 17 of the First Class City Home Rule Act provides that a city “taking advantage of this act and ... amending its charter thereunder shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions ... [,]” subject to certain enumerated limitations. 58 P.S. § 18181.
Unlike SEPTA, which is truly a mere creature of statute whose existence could be extinguished by the General Assembly and which is likely to occur if a private concern would offer to take over its transportation responsibilities, Philadelphia is a creature of the constitution charged with governance at the local level. It is for this reason that the General Assembly provided in a clear and unequivocal statement its intent that a quasi-governmental agency like SEPTA is predominant and is exempt' from local regulation.
C.
When the Philadelphia Home Rule Charter was adopted in 1951, it created the Philadelphia Commission on Human Relations to hear and enforce the Philadelphia Fair Practices Ordinance. It prohibits discrimination in the areas of: employment; housing and public accommodations; ethnicity; color; sex; sexual orientation, gender identity; religion; national origin; ancestry; age; disability; marital status; familial status; genetic information; or domestic or sexual, violence victim status. Philadelphia Code §§ 9-1103, 9-1106.
In 1955, the General Assembly enacted the PHRA, which forbids discrimination in the areas of employment, housing and public accommodations on the basis of “race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability, use of guide or support animals because of the blindness, deafness or physical handicap of the user.... ” Section 2 of the PHRA, 43 P.S. § 952. Its reach is statewide.
However, when enacting the PHRA, the General Assembly did not preempt local *1179 regulation. To the contrary, the General Assembly took that position that the more attention addressed to eliminate invidious discrimination the better, and authorized local governments to enact their own human relations ordinances. Section 12.1(a) of the PHRA states, in pertinent part, that “[t]he legislative body of a political subdivision may, by ordinance or resolution, authorize the establishment of membership in and support of a Local Human Relations Commission.” Added by the Act of January 24,1966, P.L. (1965) 1523, as amended, 43 P.S. § 962.1(a). Section 12.1(d) states that “legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act.” 43 P.S. § 962.1(d).
In Hartman v. City of Allentown, 880 A.2d 737 (Pa.Cmwlth.2005), we said that the grant of power extended to local commissions to forbid discrimination against other groups because the grant of power by the General Assembly was to allow local governments to address matters of local concern at the local level and to devote additional resources that the Commonwealth may not have to address a more immediate concern. Addressing invidious discrimination is a matter of heightened concern for Philadelphia because a substantial number of its citizens are African-Americans and gay, not to mention that a majority of SEPTA’s riders are African-Americans and women.
There is nothing in the legislative scheme that would suggest that SEPTA’s interests should predominate over the Commonwealth’s; everything suggests that Philadelphia’s governmental interest predominates. Philadelphia is a home rule municipality that has police powers to address invidious discrimination, and the General Assembly has given it the power and encouraged it to enact its own human relations ordinances and to enforce them. There is no conflict in the .legislative scheme between Philadelphia’s enforcement of its Fair Practices Ordinance and SEPTA’s legislative scheme to carry on its transportation business. Under the first prong of the Ogontz test, the relevant statutes express a clear legislative directive that Philadelphia has priority to enforce its Fair Practices Ordinance so that SEPTA cannot engage in invidious discrimination.
II.
A.
The majority does not seem to disagree that under the legislative scheme alone, Philadelphia has priority to enforce its Fair Practices Ordinance. Apparently, it would hold that SEPTA is subject to Philadelphia’s zoning and traffic laws, but for the reasons outside the first prong of Ogontz, it finds that SEPTA is not subject to the Philadelphia Fair Practices Act.
The first reason that the majority posits as to why Philadelphia’s legislative scheme predominates in zoning and traffic but not in anti-discrimination ordinances is that there would be a regulatory vacuum leaving SEPTA to do as it pleased in these important areas if SEPTA is not subject to Philadelphia’s zoning and traffic ordinances. It goes on to say that because SEPTA is subject to the jurisdiction of the Pennsylvania Human Relations Commission, then even if not subject to Philadelphia’s Fair Practices Ordinance, SEPTA is, nevertheless, prohibited by law from discriminating against its employees and customers. It seems to be suggesting that “a no harm-no foul” rationale applies.
However, under the first prong of Ogontz, we just look to see if there is a legislative priority of one agency over the *1180 other; we do not consider an extraneous and irrelevant factor of whether there is some third agency that can “pick up the slack” if we ignore the legislative priority found by examining the relevant statutes regarding those agencies. In any event, there is harm in this case in holding that SEPTA is not under the jurisdiction of a local human relations commission both because of local access and local human relations ordinances which have different protected classes than the PHRA. As the majority itself quoted from an amicus brief, “[f]or those SEPTA employees or riders who identify as lesbian, gay, bisexual or transgender, their ability to pursue claims before the local Human Relations Commission is literally the difference between having their ‘day in court’ and having ho legal recourse at all.” Amici Curiae Brief at 4. The simple answer is that the General Assembly specifically gave' Philadelphia the power to enforce its own discrimination ordinances and gave it concurrent jurisdiction to root out invidious discrimination.
E.
The second reason that the majority gives for failing to give Philadelphia priority over SEPTA is that the Fair Practices Ordinance would authorize third parties to sue SEPTA for monetary damages, including compensatory damages, punitive damages, attorneys’ fees and payment of the Commission’s own expenses. Philadelphia Code §§ 9-1105, 9-1107. It does so because employing its favorite trope that SEPTA, as an agency and instrumentality of the Commonwealth, is immune from any such actions under 1 Pa.C.S. § 2310, which provides:
Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.
Equating SEPTA with the Commonwealth itself, the majority then reasons that because suits against the Commonwealth are permissible only where the legislature has expressly waived immunity, SEPTA is immune from actions brought under Philadelphia’s Fair Practices Law because the General Assembly has not waived immunity under Section 2810. I disagree for a number of reasons.
First, just because it has been determined that SEPTA is an “agency and instrumentality of the Commonwealth” does not mean that it is the Commonwealth. The courts determine an authority’s status based on the statute under consideration, and we have looked to the legislative intent to determine whether the General Assembly intended that type of authority to be considered “the Commonwealth.” In Fisher v. Southeastern Pennsylvania Transportation Authority, 60 Pa.Cmwlth. 269, 481 A.2d 394, 397 (1981), we stated:
[W]e do not go so far as to suggest that whenever a legislative enactment refers to the “Commonwealth,” it means to embrace all authorities created by virtue of enabling acts.... The legislature many years ago recognized the need for efficient and inexpensive mass transporta *1181 tion systems designed to alleviate serious traffic difficulties in the overcrowded metropolitan areas of the Commonwealth. Thus, SEPTA and other transportation authorities were created pursuant to legislative guidelines designed to provide independent operating powers with minimal local government interference. The grant of broad powers by the Legislature was meant to insure efficient operation of the integrated transportation networks, not to expand the already large and complex state bureaucratic system. We do not believe that the Legislature intended SEPTA to be a Commonwealth agency in the traditional sense or for SEPTA employees to be considered Commonwealth employees for purposes of other legislative enactments.
In Union Switch & Signal, Inc., a claim was brought by a contractor against SEPTA before the Board of Claims on the basis that, as an agency of the Commonwealth, jurisdiction had to be before the Board of Claims because the Board was designated as having exclusive jurisdiction over contract claims when immunity was waived for such claims. Over SEPTA’s objection that the Board of Claims did not have jurisdiction, the Board of Claims refused to dismiss the appeal. SEPTA then appealed to this Court, and we held that the Board of Claims lacked jurisdiction to entertain contract claims against SEPTA because SEPTA is not the “Commonwealth.” Union Switch & Signal, Inc., 637 A.2d at 668-69. See also Quinn v. Southeastern Pennsylvania Transportation Authority, 659 A.2d 613 (Pa.Cmwlth. 1995) (holding that SEPTA was a local agency and not an agency of the Commonwealth for jurisdictional purposes and, thus, the court of common pleas had jurisdiction over the appeal); Fraternal Order of Transit Police By and Through Lamb v. Southeastern Pennsylvania Transportation Authority, 668 A.2d 270 (Pa.Cmwlth. 1995) (same); Bolden v. Southeastern Pennsylvania Transportation Authority, 953 F.2d 807 (3rd Cir.1991), cert. denied, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992) (holding that SEPTA was not the “Commonwealth” and not entitled to immunity under the Eleventh Amendment to the United States Constitution).
Second, even if it was the Commonwealth, the General Assembly has waived immunity for actions against SEPTA brought under local human relations ordinances. To determine whether the General Assembly intended SEPTA to be immune from actions brought under local human relations ordinances, the majority acknowledges that the General Assembly has waived SEPTA’s immunity from suits arising from discrimination by making it subject to the jurisdiction of the Pennsyl-vania Human Relations Commission.
As mentioned before, Section 12.1(d) of the PHRA states that “legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act.” 43 P.S. § 962.1(d). Under this provision, similar powers and duties that are exercised by the Pennsylvania Human Relations Commission can be exercised by the Philadelphia Commission on Human Relations. Part of the power given under this provision to local human relations commissions is jurisdiction over Commonwealth agencies to root out invidious discrimination.[4]
*1182 For example, under the Philadelphia Fair Practices Ordinance, an “Employer” is defined as “[a]ny person who does business in the City of Philadelphia through employees or who employs one or more employees exclusive of parents, spouse, Life Partner or children, including any public agency or authority; any agency, authority or other instrumentality of the Commonwealth; and the City, its departments, boards and commissions.” Philadelphia Code § 9-1102(h). This is similar to the power given to the Pennsylvania Human Relations Commission, and if SEPTA would discriminate against a minority in hiring, it would be subject to the Philadelphia Commission on Human Relations’s jurisdiction.
Finally, even if it was true that SEPTA is immune under 1 Pa.C.S. § 2310 from monetary damages, that does not mean that SEPTA is not subject to the jurisdiction of the Philadelphia Commission on Human Relations. If it were so, then it is subject to the local human relations ordinance; a complainant could not get monetary damages but that does not mean that other relief is not available. 1 Pa.C.S. § 2310 does not make the state immune from prohibitory injunctions to restrain a state agency from engaging in unlawful conduct. See Stackhouse v. Pennsylvania State Police, 892 A.2d 54 (Pa.Cmwlth.), appeal denied, 588 Pa. 760, 903 A.2d 539 (2006). For example, in City of Pittsburgh v. Commonwealth, 468 Pa. 174, 360 A.2d 607 (1976), our Supreme Court held that the Department of Corrections had to comply with local zoning; if the Department of Corrections did not comply, then the municipality could seek an injunction to force it to comply. Similarly, if SEPTA has a practice of not hiring gay people, then under Section 1105(a) of the Fair Practices Ordinance, Philadelphia Code § 9-1105(a), the Philadelphia Commission on Human Relations could bring an equity action to cease and desist such an employment practice.
From the foregoing, it is clear from the legislative scheme that the Philadelphia *1183 Fair Practices Ordinance, just like its zoning and traffic laws, apply to SEPTA. Not only does the legislative scheme show that, in fact, the General Assembly authorized the local government to engage in adoption and enforcement, along with any concurrent exercise by the Pennsylvania Human Relations Commission by authorizing local governments to enact and enforce local ordinances similar to those that the Pennsylvania Human Relations Commission enforces. Because it is apparent from the language of the applicable statutes that the legislature intended and specifically provided to subject SEPTA to the Fair Practices Ordinance, I need not proceed to the second prong of Ogontz but, like the majority, I will do so for the sake of completeness.
III.
Under the second prong of Ogontz, if the legislative priority cannot be discerned, courts must try to glean legislative intent in a way that “would give effect to the legislative mandates of both governmental entities.” Id. at 455. The majority adopts SEPTA’s argument that it would not be able to carry out its legislative mandate if it was subject to the Philadelphia Fair Practices Ordinance because it would add another layer of regulation provided in federal and state civil rights laws, and its legal obligation would change in the course of a single bus trip because its service area extends beyond Philadelphia. The majority also buys SEPTA’s argument that it will be required to expend scarce resources on a daunting legal investigation of what it can do and where it can do it, and not on its central mission of providing public transportation services. The majority concludes that subjecting SEPTA to local anti-discrimination laws could prove overwhelming and damage the public “fisc.”
I agree with Judge Simpson that there is nothing on the record to support these conclusions and would join in his dissent of the need to remand to the trial court for factual findings. However, the majority’s reasons are so specious that they can be rejected out of hand thereby obviating the need for a remand. Let’s look at those reasons proffered by the majority.
First, as to the majority’s assumption that it would be a daunting task to keep track of the applicable local human relations ordinance and impede its ability to carry out its public transportation responsibilities. Trucking companies, airlines and private bus companies are subject to these types of regulations in every city that they serve but they still manage to conduct their business, mostly at a profit. If they can do it, SEPTA can do it if it wants to.
Second, the idea that SEPTA cannot keep track of the local human relations ordinance of each municipality in which it operates is ludicrous. This premise is built on the notion that “SEPTA” just travels through these communities in hermetically-sealed tubes letting passengers on and off, and has no contact at all with the local officials in communities in which they operate. However, it has facilities such as tracks, stations, bus shelters, switches, maintenance stations, vending machines and electric lines in each of those communities, yet it somehow manages to keep track of each of those facilities. This is much more difficult than getting an ordinance from the 100 or so municipalities in which SEPTA operates, even if each of them has enacted one.
Not only that, SEPTA manages to know and comply with all the traffic and zoning codes of the various municipalities through which it travels, but the task somehow becomes “daunting” when it involves obtaining the relevant local human relations *1184 ordinances. Certainly that task is even less daunting than keeping track of traffic, but especially zoning codes, because the PHRA requires all human relations ordinances to be similar while zoning ordinance are community specific. Moreover, SEPTA’s lawyers do not even have to leave the office and can just go to the websites of all the communities that post their ordinances, including human relations provisions, or it could just ask the Pennsylvania Human Relations Commission. If SEPTA’s inside and outside lawyers[5] find the task too difficult, perhaps they should get their station masters, yardmen, maintenance chiefs and landsmen who are in these communities every day to take over that function. It will probably be the easiest thing they have to track.
Third, the idea that SEPTA’s compliance with all of these ordinances would be so overwhelming that, as a consequence, its ability to provide transportation services would be impeded because it would require constant monitoring to remain current and all employees would have to be trained accordingly to such an extent belies common sense. Comcast is located in Philadelphia, but operates in certainly more than 100, and probably more than 10,000 communities, and yet, somehow, manages to keep track of these types of ordinance and understands its obligations in each community in which it serves. Moreover, aside from all of these human relation ordinances being similar, instructing all of your employees to act in a fair and non-discriminatory manner should be instilled from the moment of employment. This should not be considered to be a burden, but an opportunity for an “instrumentality of the Commonwealth” to advance the public policy of the Commonwealth. If Comcast can do it, certainly SEPTA can do it if it wants to.
The second dire consequence that the majority identifies is that it would divert resources away from SEPTA’s core mission of providing public transportation if it is made subject to local human relations ordinances and must handle and pay damages for those claims. Again, this argument is specious. SEPTA is subject to damages under the PHRA, so even if it was not subject to Philadelphia’s Fair Practices Ordinance, the public fisc would not be substantially harmed. In any event, the General Assembly wanted the public fisc to be harmed if governmental agencies engaged in invidious discrimination.
IV.
Finally, nothing in the Metropolitan Transportation Authorities Act evidences any intent that SEPTA has priority over Philadelphia’s interest in making SEPTA the subject of Philadelphia’s Fair Practices Ordinance or the jurisdiction of the Philadelphia Commission on Human Relations. To the contrary, the General Assembly made it clear that local governments are authorized to enact local human relations ordinances to carry out the announced policy of the Commonwealth to root out invidious discrimination and to supplement its efforts which would have priority over the legislative grant to provide public transportation, a function that it assumed from private companies.
*1185 If we reach the second Ogontz prong that instructs us to glean legislative intent in a way that “would give effect to the legislative mandates of both governmental entities,” id. at 455, the majority’s finding that just knowing what those ordinances provide is so daunting and overwhelming and is not supportable. The consequence of making SEPTA subject to Philadelphia’s Fair Practices Ordinance would mean that more invidious discrimination would be abated, while the trains, buses and trolleys would still run on time, or almost on time, not only a carrying out of the mandate of both agencies but also fostering the public good.
Accordingly, I respectfully dissent and would affirm the decision of the trial court.

. Act of April 21, 1949, P.L. 665, as amended, 53 P.S. §§ 13101-13157.

. Act of October 27, 1955, P.L. 744, as amended, 43 P.S. §§ 951-963.

. Philadelphia became a home rule municipality under the First Class City Home Rule Act. Pennsylvania initially adopted home rule in a 1922 Amendment to Article 15, Section 1 of the Constitution of 1874, which provided:
Cities or cities of any particular class may be given the right and power to adopt their local charters and to exercise the powers and authorities of local self-governments, subject however, to such restrictions, limitations and regulations as may be imposed by the legislature.
In the half century that the 1922 Amendment was in effect, only one city, Philadelphia, was granted home rule status by the General Assembly. In 1968, the Constitution was amended to require the General Assembly to grant more local municipalities home rule power.

. In footnote 20, the majority responds to my dissent by saying that while the General Assembly gave “powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act” in Section 12.1(d) of the *1182 PHRA, 43 P.S. § 962.1(d), that does not mean that it gave local commissions jurisdiction over SEPTA. The point of the dissent, though, was because the General Assembly gave to the Pennsylvania Human Relations Commission power over SEPTA, and it gave local commissions’ similar power, it must have wanted local commissions to exercise jurisdiction over claims of discrimination by local authorities. It is the same as with local zoning: there is no dispute that SEPTA is subject to local zoning and, necessarily, local zoning boards have jurisdiction.
Acknowledging that because local governments can expand the protected classes set forth in Section 12(b) of the PHRA because the General Assembly only said that local governments could enact similar and not identical human relations ordinances, the majority then goes on to state that because it is not limited by PHRA, that somehow takes away Philadelphia's power over SEPTA. Implicit in that argument is that if the General Assembly had provided that restricted local human relations ordinances to having identical provisions, Philadelphia would have jurisdiction over SEPTA.
A more expansive grant of power by the General Assembly does not lead to the conclusion that it did not want the same people and organizations that are subject-to PHRA, then not to be subject to local human relations ordinances. Quite the contrary, the General Assembly, by not limiting local human relations ordinances to identical subjects of discrimination, evidenced that it gave local governments the additional power to add provisions necessary to protect suspect classes and, like in PHRA, wanted SEPTA to be made subject to local ordinances just like every other person and business.
Philadelphia has expanded the classes from those set forth in that provision to include sexual orientation, gender identity, marital status, genetic information or domestic or sexual violence victim status. Philadelphia Code §§ 9-1103, 9-1106. Under the majority view, SEPTA is free to discriminate against those classes of people without any recourse anywhere.

. That is apparently what the Pennsylvania Association of Realtors did. See http://www. parealtor.org/local-nondiscrimination-ordinances. The following site lists the local human relations ordinances that are currently in effect, https://mazzonicenter.org/resources/ list-pennsylvania-ordinances-prohibiting-discrimination-based-sexual-orientation-gender-id.